In the Matter of the Estate of WILLIAM A. BRADFORD, Deceased.

Surrogate's Court, Sullivan County, October 20, 1937.

*J. H. Brady*, for the administrator.

*John D. Lyons* [*Nellie C. Smith* of counsel], for Anna C. Gurney, claimant.

*Edward S. Griffing*, for Griswold S. Hayward, Jr., legatee.

COOKE, S.   William A. Bradford died on or about December 22, 1934.   For some years prior thereto he spent part of his time upon his property which is located about five or six miles southerly of the village of Monticello, N. Y.   This place consists of about 8,000 acres, mostly wild and forest lands, in the towns of Thompson and Forestburgh.   Upon it was a large stone building called the lodge, with several outbuildings nearby.   There were also some bungalows and cabins situated at various locations on this property which were occupied by men employed by him as watchmen, etc.   There were fishing streams running through it, ponds or lakes upon it, and it was generally known as a hunting and fishing preserve.   He also had an office on Wall street, New York city, and spent some of his time there looking after his various interests.   Prior to the depression Mr. Bradford had been a man of means and affluence. His wealth had been seriously depleted during that period.   He was a gentleman well along in years and enjoyed the fishing and hunting upon his estate and was interested in the propagation of trout, having a fish hatchery and several small trout ponds for this purpose.   He was an intelligent and capable businessman.

It appears that Mrs. Anna C. Gurney, the claimant herein, was a member of his household at various times during the years he owned this property; that she employed and paid Mrs. La Barr to do some of the housework during a part of this period; that she at times purchased feed for the two or three cows and some chickens kept on the place, and on some occasions gave orders and directions to the help in and about the premises.

In or about the month of February, 1935, Mrs. Gurney filed a claim against this estate, consisting of two notes and claims for loans of stock.   One claim was for a note dated July 21, 1931, for $2,500 and interest, and also for a note dated September 1, 1931,

for $1,500 and interest. Although this claim on these two notes was at first rejected, later the administrator allowed the same.

Her claim in the stock transaction is based upon two written instruments, as follows:

*" Sep. 23rd 1929*
GREENFIELD, MASS.

" Mrs. ANNA C. GURNEY

" MY DEAR ANNA: " This is to certify that you have today loaned me one Hundred shares of United States Steel common stock — I have given this stock which stands in your name to J. R. Williston & Co. as additional collateral to my account —, At any time on demand from you I agree to return this stock to you.

" Sincerely yours —
" W. A. BRADFORD."

*" Oct. 22nd, 1929*
GREENFIELD, MASS.

" ANNA C. GURNEY

" DEAR ANNA: You have loaned me today two Hundred shares of Kennecott Copper Corporation Stock, which I have deposited with J. R. Williston & Co. 11 Wall St. as additional margin to my account —

" I agree to return this stock to you on demand —
" Sincerely yours
" W. A. BRADFORD."

Mr. Bradford deposited this stock with his brokers as additional margin to his account. This was ratified in writing by Mrs. Gurney. On November 6, 1929, the shares of Steel stock were sold by the brokers and $18,471, the avails thereof, was credited to Mr. Bradford's account. On November 7, 1929, the 200 shares of Kennecott Copper were sold and $14,382 was received therefrom.

Over five years thereafter, and after Mr. Bradford's death, which occurred in December, 1934, and in or about February, 1935, Mrs. Gurney filed a claim against his estate for the value of this stock at the time she loaned it to him. She now claims she should be allowed for the value of this stock at the time it was sold in November, 1929. We are called upon to determine what was the agreement between these parties and what was reasonably intended and contemplated by them within the confines of that agreement. It seems that Mrs. Gurney must have known that this stock would likely be sold, or could be sold, and that whatever was received therefrom would be credited to Mr. Bradford's account.

There was not any unauthorized exercise of the right of ownership over this stock by Mr. Bradford to the exclusion of the rights of Mrs. Gurney. Whatever Mr. Bradford did, he had a right to do, under the agreements. There was not any unauthorized taking of this stock or any intermeddling with it beyond the extent of the authority conferred. There was, therefore, no conversion of this stock beyond the extent of his authority. In so far as the record shows, the relations of these parties, for many years prior to and after these transactions, were friendly and cordial. With the knowledge which Mrs. Gurney had that these shares might be sold, the only manner by which Mr. Bradford could return them to her on demand from her if they were sold, would be to return an equal number of shares, even though he did not return the identical certificates which she had loaned to him. (*Carlisle* v. *Norris*, 215 N. Y. 400.)

From *Matter of Cooke* (147 Misc. 528, 529) we take the following:

" It is stipulated by and between Walter P. Chrysler, the Chemical Bank and Trust Company, and the accounting parties with regard to the facts affecting their intent: That, on November 12, 1929, Walter P. Chrysler delivered to the decedent 5,000 shares of the stock of the Chrysler Corporation and on November 14, 1929, he likewise delivered another 5,000 shares of the stock of the Chrysler Corporation; that said certificates of stock so delivered were registered and stood on the books of the said Chrysler Corporation in the name of J. H. Bache & Co. and were all duly indorsed in blank for transfer; that, notwithstanding such record ownership all of the aforesaid certificates of stock belonged to said Chrysler, the said J. H. Bache & Co. being the nominee of said Chrysler; that the delivery of said certificates of stock was made gratuitously by said Chrysler for the sole purpose of enabling the said decedent to support his credit in connection with loans made to him by certain named financial institutions; that it was agreed between the decedent and said Chrysler at the time of their delivery that said certificates of stock would be pledged by the decedent as collateral to secure further the loans made to the decedent by said institutions; it was understood between the decedent and said Chrysler that such certificates of stock would be returned to Chrysler as soon as either (1) the decedent's own collateral had risen in value sufficiently to secure said loans, or (2) sooner, upon demand of said Chrysler; that, in order to establish a certain amount of loss or gain for income tax purposes, said Chrysler, with the knowledge of decedent, *substituted* for the certificates other certificates for a like number of shares, thus repossessing himself with said original certificates; that such *substituted* certificates which were

then owned by said Chrysler were registered in the name of Shippee & Rawson, and indorsed in blank for transfer by them, they being the nominees of said Chrysler; that four certificates for 100 shares each of Chrysler Corporation stock are now held by the Marine Midland Bank and Trust Company, subject to the conflicting claims of the administrators herein and said Chrysler; and that another 70 shares of Chrysler Corporation stock are now held by said Marine Midland Bank and Trust Company, and likewise subject to said conflicting claims, making in all 470 shares so held subject to said claims.

"There is a further stipulation between said Chrysler and the accounting parties hereto to the effect that on November 12, 1929, said Chrysler delivered to decedent 5,000 shares of the capital stock of the Chrysler Corporation, and on November 14, 1929, he delivered to decedent an additional 5,000 shares; that the conditions under which said 10,000 shares of stock were delivered by Chrysler to decedent were set forth in the first above-mentioned stipulation between the parties hereto and the Chemical Bank and Trust Company; that no demand was made by Chrysler upon decedent during his lifetime; that the first demand for the return of said stock was made on October 1, 1931, by letter of that date addressed to the administrators of the decedent; that on said date said Chrysler for the first time notified the various banks in which said stock had been pledged by the decedent with the consent of said Chrysler, of his interest in said stock; that none of said shares of stock have been returned to Chrysler; that the loss or damage to Chrysler by reason of the failure of decedent to return to him said shares of stock is established at the rate of $12.50 per share, being the value per share of the stock at the close of the New York Stock Exchange on October 1, 1931, the date of his first demand for the return thereof.

"There was offered in evidence a receipt signed by Delos W. Cooke, dated November 12, 1929, addressed to Mr. Chrysler. It acknowledged receipt of 5,000 shares of Chrysler Corporation stock, named the numbers of the certificates and said: ' I agree to return upon demand by you.'

"Under date of November 14, 1929, Delos W. Cooke, by J. J. Peppard, one of his present administrators, addressed Mr. Chrysler and acknowledged receipt of another 5,000 shares of said stock, and said: ' I agree to return upon demand by you.'

"By letter dated November 14, 1929, Mr. Cooke personally acknowledged the receipt of 5,000 shares of said Chrysler stock, giving the certificate numbers.

" These acknowledgments related to the first 10,000 shares of the Chrysler stock. No letter was written by Cooke with regard to the substituted stock.

" By letter dated October 1, 1931, eight months after Cooke's death, Mr. Chrysler addressed the administrators of the decedent and demanded the return of said 10,000 shares of Chrysler Corporation capital stock, in which he said that he had ' notified all the banks with which I understand Mr. Cooke has deposited my stock, that the stock is my property and not his.' "

Here the stock was delivered gratuitously by Chrysler and it was to be returned upon demand. Cooke died in February, 1931, and it developed he was insolvent. The banks sold the collateral or the greater part of it to satisfy the loans. Eight months after Cooke's death, or on October 1, 1931, Chrysler made his demand of the administrators. It was stipulated that the date of his fiist demand for the return of the stock, October 1, 1931, fixed its value for his claim.

At page 532 it states: " The stock in the instant case is a chose in action. (*First National Bank* v. *Maine*, [1932] 284 U. S. 312, 327.) Stock certificates are designed to circulate freely in the channels of commerce. Elements of negotiability of certificates of corporate stock lacking at common law have been supplied by the Personal Property Law. The Legislature has declared the public policy of the State with respect to the transfer of stock certificates. (*Pierpoint* v. *Hoyt*, 260 N. Y. 26.) Title to a certificate may be transferred by delivery of the certificate indorsed in blank (§ 162) and such delivery is effectual, except as provided in section 168, though made by one having no right of possession and having no authority of the owner of the certificate or from the person purporting to transfer the title. (*Turnbull* v. *Longacre Bank*, 249 N. Y. 159, 164.) "

In *Noble* v. *Haff* ([Sup.] 172 N. Y. Supp. 139, 141) it appears Mr. Haff signed a receipt as follows:

" NEW YORK, *November 4, 1909.*

" Received from Mrs. Florence Noble 10 shares American Smelting & Refining Company stock, certificate No. 500041."

The plaintiff in that case claimed that Haff agreed to return this stock upon demand. One of the witnesses to the transaction claimed that Mr. Haff said he wished to secure and protect Mrs. Noble to the extent of ten shares of Smelters. There the united court said: " The decedent received the stock rightfully, as custodian or otherwise. He was not called upon to return such stock until a demand was made upon him for its return. The plaintiff cannot

show that she made a demand on him during his lifetime, and upon the evidence admitted herein her right to the return of the stock did not accrue until after she had made a demand on his personal representatives after his death. At the time the plaintiff delivered the stock to the decedent, its value was $1,150, and she has recovered a judgment for that amount. At the time she demanded the stock from the present defendants the stock was worth only $600 for the ten shares, and the highest price which it reached within a reasonable time thereafter was about $620. Since the decedent did not convert the stock on November 4, 1909, the price at that date is entirely immaterial and the plaintiff could, upon the evidence presented in this trial, in no event recover more than the sum of $620."

Whether this stock went up or down in the market after the delivery to Mr. Bradford by Mrs. Gurney cannot affect their contractual relations.

That these transactions were loans with the right to Mr. Bradford to dispose of this stock is apparent.

In case the shares were sold, the only way Mr. Bradford could comply with the agreements, in case demand was made, would be to return an equal number of shares or at that time to have his liability determined according to its value at the time of the demand.

The administrator further contends that Mr. Bradford and Mrs. Gurney, after this stock was sold in November, 1929, continued their understanding that these were loans and that Mrs. Gurney was entitled to the dividends declared by reason of the fact that shortly after these dividends were declared Mr. Bradford gave Mrs. Gurney for some time a check covering this amount, and the proper inference to draw therefrom is that he did, for a time at least, made good to Mrs. Gurney the amount of these dividends. Although Mrs. Gurney was in court, she did not take the stand and give any other explanation of these checks. The administrator having opened the door as to the transaction, Mrs. Gurney could have testified, if she so desired, as to those checks if they were received for a different purpose. (See *Martin* v. *Hillen*, 142 N. Y. 140.) There is not any evidence that Mrs. Gurney ever made any demand for the return of this stock until she filed her claim herein on or about February 26, 1935.

It seems that on or about May 28, 1935, the administrator herein purchased 300 shares of stock as loaned by Mrs Gurney to Mr. Bradford and tendered said shares to Mrs. Gurney, who did not accept them. This tender was kept good for a reasonable time. It could not be expected that the administrator would hold the

stock for an unreasonable period and hold it subject to the fluctuations of the market.

This tender gave Mrs. Gurney an opportunity to repossess herself of this stock if she so desired.

Not having proven any demand except the filing of her claim herein, and its value at the time of the tender being slightly greater than when she filed her claim, and the administrator by his brief, relying upon either one of those dates as to the making of the demand and the fixing of the liability herein, her claim upon the stock transactions may be allowed at $7,540, being its value when tendered, with interest from May 28, 1935, and at $450 for balance of unpaid declared dividends, with interest from the respective dates when declared. It could be said that the filing of the claim constituted the making of a demand.

Her claim on the two notes is not now disputed and is allowed as follows:

Promissory note for $2,500 dated July 21, 1931, with interest from its date, and another promissory note for $1,500 dated September 1, 1931, with interest from its date.

The administrator asserts that Mrs. Gurney is indebted to this estate and claims she removed certain personal property belonging to it, and that the estate is entitled to an offset or counterclaim herein for the value of such property.

A discovery proceeding under section 205 of the Surrogate's Court Act was not instituted. In that proceeding the respondent could be ordered to attend and be examined accordingly. It would seem that more evidence could have been given upon these questions in a proceeding of that kind and more information obtained upon which findings could be made.

After Mr. Bradford's death, and before a representative was appointed, Mrs. Gurney came to the lodge and there had several pictures and other articles packed and had them sent to the Chelsea Storage Company in New York. Among these it is claimed were two oil paintings of the value of $1,900 and a marble statue of the value of $600. The evidence from which the deduction is requested as to Mrs. Gurney having taken these two oil paintings is very indefinite and uncertain. The two oil paintings referred to were made upon the property while a former owner was in possession. One was a painting of Eden Valley taken from the back porch of the lodge, and the other a smaller picture of a dog on retrieve. The weight of the evidence would indicate that these pictures never came into Mr. Bradford's possession and were not at the lodge while he owned it. It seems that while Mr. Monell's estate was the owner of this property a private appraisal of the

personal property at the place at that time was made by some firm in New York city and it is assumed that Mrs. Gurney took those paintings, and the value is based upon that appraisal. Two reliable witnesses, Mr. and Mrs. Moore, who were employed at the lodge when Mr. Bradford took possession of it, testify that these paintings were not there during Mr. Bradford's ownership, and other evidence leads to the conclusion that these were not among the pictures taken by Mrs. Gurney. In order to charge Mrs. Gurney with the value of articles of personal property claimed to have been taken by her, it is necessary for the administrator to prove sufficiently and satisfactorily what articles were taken, that they were the property of this estate, and what was their fair market value. A witness as to value must be shown to be competent to speak upon the subject. He must have dealt in or have some knowledge of the article concerning which he speaks. Persons should be conversant with the particular article and of its value in the market. A witness who testifies to the value of property must have seen the thing in question besides being conversant with the value of similar things.

Mr. MacIntosh, who attempts to put the value upon these paintings, never saw them. As to the statue, the only evidence as to its value is given by the administrator who said he thought he would put a value on it, and $600 was his guess, it looked good, and he wanted to have it enough. The evidence is, therefore, insufficient to charge Mrs. Gurney with the value of the paintings or the statue.

A counterclaim or offset is made against Mrs. Gurney for $1,360 for an assortment of liquors. The evidence as to this item is meager and unsatisfactory. Asserting it, the burden is on the administrator to show by a fair preponderance in the weight of the testimony that he is entitled to this allowance. The only testimony upon this matter seems to be that of the administrator in answer to questions of Mrs. Gurney's counsel. From this it may be gathered that Mrs. Gurney had this personal property in her possession and under her control. When she got it or how she became possessed of it does not appear. If it had at one time belonged to Mr. Bradford, which may have been the fact, and he later clothed her with apparent ownership, he created the condition which now, to some extent at least, rests upon suspicion and conjecture. Conversations claimed to have been had by the administrator with the decedent are not binding upon Mrs. Gurney when held not in her presence. The balance of the testimony upon this subject is not sufficient to find that Mr. Bradford was the owner thereof at the time of his death. Strong suspicion or some

slight evidence based upon an alleged conversation is not enough, and especially so when different deductions may be drawn from that conversation.

The situation of the parties which has not been very much revealed by the evidence makes it difficult to determine the ownership of some of the personal property at the lodge after the death of Mr. Bradford.

It seems that during the month of December, after Mr. Bradford's death and before an administrator was appointed, Mrs. Gurney came to the lodge, had several articles packed and taken away. There were twenty to twenty-five different packages. Some were pictures of persons. Just what were in those packages does not clearly appear. Whether or not they were the property of Mr. Bradford or Mrs. Gurney or what was their value cannot be ascertained from the evidence.

On or about the 15th or 16th of January, 1935, Mr. MacIntosh, in company with some other persons, went through the lodge and made a list of the personal property. An inventory was not made by appraisers appointed by the court. On or about May fifteenth he went through again and says certain articles were missing, and these he sets up as articles taken by Mrs. Anna C. Gurney after the appointment of an administrator and without his consent and for which she gave no receipt. The proof as to those articles being taken by Mrs. Gurney and as to their value is too indefinite and uncertain to base a finding that she took them and what their value was. Other persons had access to this building during this period.

There are several articles listed as taken by Mrs. Gurney for which she gave a receipt. Many of these were received June 3, 1935. Some of this personal property is furniture, garden tools, wheelbarrow, lawn mower, chicken wire, etc. There is a list of these, so it is definite and certain just what those articles were. The testimony of Mrs. La Barr as to some of these is not conclusive and convincing. It would be rather unusual for a man of Mr. Bradford's business ability to adopt the method as described by her to denote the ownership of certain articles in the lodge. It seems that there is enough evidence as to these articles belonging to this estate for Mrs. Gurney to have furnished more satisfactory proof of her ownership, if she were the owner thereof. They were there and a part of this property owned by Mr. Bradford. The value of these articles is found to be the sum of $750, and the estate in its counterclaim and offset is allowed that amount for these items.

Order may be agreed upon or settled on two days' notice.