Arthur C. ANSLEY, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 11318.

United States Court of Appeals Third Circuit.

Argued Oct. 5, 1954.

Decided Nov. 22, 1954.

Victor R. Wolder, New York City, for petitioner.

Grant W. Wiprud, Washington, D. C., (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Robert N. Anderson, Alonzo W. Watson, Jr., Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before MARIS, McLAUGHLIN and STALEY, Circuit Judges.

STALEY, Circuit Judge.

The Tax Court held that there were deficits in the income tax of Arthur C. Ansley for the years 1945, 1946, and 1947.[1] The taxpayer contends on this appeal that the Tax Court erred: (1) in treating an approximate $29,000 loss as a "non-business debt" loss rather than a "business" loss or a loss from a "transaction entered into for profit;"[2] (2) in finding that the $29,000 loss was not sustained in 1947; and (3) in holding that the Ansley Radio Corporation stock had not become worthless in 1947.

The following facts were found by the Tax Court:

The taxpayer, Arthur C. Ansley, was the president, general manager, and principal stockholder (owning over 90 per cent of the outstanding corporate stock) of the Ansley Radio Corporation, which existed under the laws of New York from 1932 to 1946 and under New Jersey laws from 1946 to its adjudication in bankruptcy in 1948.

From the time of its organization, the taxpayer had made personal loans to the corporation and occasionally had endorsed its notes. All loans were repaid, and at no time was the taxpayer required to make any payments by reason of having endorsed the corporation's notes.

1. The opinion in this case is not officially reported but may be found in 12 T.C.M. 1110 (1954).

2. This issue is important to the taxpayer because a deduction for a "non-business debt" loss must be taken as a short-term capital loss, 26 U.S.C. § 23(k) (4), infra note 4, whereas a "trade or business" loss or a loss from a "transaction entered into for profit" may be taken as an ordinary deduction. 26 U.S.C. § 23(e) (1) and (2), infra note 3.

# 254

In May, 1946, the First Mechanics National Bank of Trenton, New Jersey, loaned the taxpayer $28,000 at 2 per cent interest. The loan was secured by United States Treasury 2½ per cent bonds in the face amount of $30,000. In turn, the taxpayer made a loan to the corporation of $30,000 at 5 per cent interest. In June of 1946, a public stock issue was planned by the corporation as a method of raising additional capital. Rather than continuing to have the corporation's debt owing to its president and majority stockholder, the corporation borrowed $30,000 from the bank at 2 per cent interest in order to cancel its $30,000 debt to the taxpayer. In the arrangement, the taxpayer's $28,000 debt to the bank was cancelled. By agreement, the bank retained the taxpayer's bonds as security for the corporation's $30,000 note, the corporation agreeing to pay the taxpayer 3 per cent for the use of his bonds as security. The bonds were to be returned to the taxpayer as soon as the corporation's note to the bank was paid.

On February 20, 1947, because of the development of certain unfavorable business conditions, the corporation filed a petition for reorganization under Chapter 10 of the Bankruptcy Act, 11 U.S. C.A. § 501 et seq. The petition was approved, and the taxpayer was appointed operating trustee. On July 3, 1947, the bank sold the taxpayer's bonds because the corporation failed to meet the bank's demand for payment of the $30,000 note.

The corporation's difficulties became steadily worse. The taxpayer, as operating trustee, the disinterested trustee, and the creditors' committee attempted to find a satisfactory plan of reorganization. In September of 1947, the creditors' committee refused to consider a plan which provided for settlement of claims at 12½ cents on the dollar.

A general feeling of pessimism had set in by November, and the only hope remaining was for the possible production of an electronic piano, a new development which was unique in the trade, but this failed to materialize. The corporation suffered a net-operating loss of $74,679.63 during the last six months of 1947. On January 8, 1948, the creditors' committee made a final decision to request liquidation of the corporation. Adjudication in bankruptcy followed on February 16, 1948. In the bankruptcy liquidation proceedings, the assets of the corporation were insufficient to pay priority claims in full, and no sums were ever paid to the general creditors, including the taxpayer.

We hold, contrary to the Tax Court, that the taxpayer's $29,000 loss was a loss sustained as a result of a "transaction entered into for profit" within the purview of Section 23(e) (2)[3] of the Internal Revenue Code and was not a "non-business debt" loss under Section 23(k) (4).[4]

---

3. "§ 23. Deductions from gross income.
"In computing net income there shall be allowed as deductions:
*    *    *    *    *
"(e) Losses by individuals.
"In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—
"(1) if incurred in trade or business; or
"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business * * *." 26 U.S.C. § 23(e) (1) and (2).

4. "§ 23. Deductions from gross income.
"In computing net income there shall be allowed as deductions:

*    *    *    *    *
"(k) Bad debts.
*    *    *    *    *
"(4) Non-business debts.
"In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term 'non-business debt' means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." 26 U.S.C. § 23(k) (4).

It is clear that the taxpayer sustained his loss because of his agreement to lend his bonds as security for the bank's loan to the corporation. At the time the bonds were loaned to the corporation, no debtor-creditor relationship was established between the taxpayer and the corporation or the bank, so that there was no debt owing to the taxpayer which could have become bad.

By lending his guarantee, in the form of bond collateral, the taxpayer was motivated by a desire to protect and perhaps augment the value of his capital stock. In principle, the loan of the bonds does not differ from an endorsement by a guarantor who lends his credit to guarantee corporate notes. We recently held in Pollak v. Commissioner of Internal Revenue, 3 Cir., 1954, 209 F.2d 57,[5] that a taxpayer's guarantee by way of endorsing corporate notes constituted a transaction entered into for profit since the taxpayer was a large stockholder and his guarantees were a means of enabling the corporation to prosper and improve its position, thereby protecting any value which the guarantor's stock might have. In the present case, the taxpayer's anticipated profit from the loan of his bonds was not limited to protecting or increasing the value of his stock, but he was also to receive three per cent of the value of the bonds annually as payment for the use of his bonds.

On July 3, 1947, the bank sold his bonds to satisfy the corporation's note. It was at that time that a definite, identifiable loss was suffered. To say otherwise would be unrealistic, for the taxpayer was in a distinctly different financial situation after the sale. Before the sale he owned bonds worth $30,000; after the sale the bonds belonged to another. Because of the agreement and the loan of the bonds, the taxpayer, who expected to profit from the deal, found himself without the $30,000 worth of bonds.

The loss was one incurred as the result of a transaction entered into for profit, and the taxpayer was entitled to a deduction under Section 23(e) (2), unless he was "compensated" for his loss within the meaning of Section 23(e), for a loss can only be taken if "not compensated for by insurance or otherwise." [6]

■ The taxpayer received in return for the loss of the bonds a subrogee's unsecured rights against the corporation, which had been in reorganization proceedings for almost five months and against which creditors were threatening liquidation. His rights as a subrogee were valueless to him without a court-approved plan of reorganization acceptable to the creditors and, indeed, even then his rights might be valueless. A subrogee's rights in such a situation are very limited. He holds merely an expectation that he might be compensated for his loss, and his expectation totters in the midst of the corporation's financial distresses. The Treasury Regulations speak of compensation including "salvage value." [7] The taxpayer salvaged from his loss his rights as subrogee. The salvage value of these rights was highly conjectural, and eventually proved to be worthless. He received nothing when reorganization of the corporation failed and liquidation followed. Pollak v. Commissioner of Internal Revenue, 3 Cir., 1954, 209 F.2d 57; Fox v. Commissioner of Internal Revenue, 2 Cir., 1951, 190 F.2d 101; Cf. United States v. S. S. White Dental Mfg. Co., 1927, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120; Cahn v. Commissioner of Internal Revenue, 9 Cir., 1937, 92 F.2d 674.

■ The Tax Court also decided that the taxpayer had not carried his burden of establishing the worthlessness

---

5. The Tax Court's opinion was rendered on September 30, 1953, approximately three months before the Pollak decision on January 6, 1954.

6. 26 U.S.C. § 23(e), supra note 3.

7. "* * * Full consideration must be given to any salvage value and to any insurance or other compensation received in determining the amount of losses actually sustained. * * *" U.S.Treas.Reg. 111, § 29.23(e)–1, 26 Code Fed.Regs. § 29.23 (e)–1(b).

**256**

of the Ansley Radio Corporation stock in the year 1947. We do not agree. Admittedly, "The Tax Court is entitled to draw whatever inferences and conclusions it deems reasonable from such facts. And an appellate court is limited, under familiar doctrines, to a consideration of whether the decision of the Tax Court is 'in accordance with law.' 26 U.S.C. § 1141(c) (1), 26 U.S.C.A.Int. Rev.Code, § 1141(c) (1). If it is in accordance, it is immaterial that different inferences and conclusions might fairly be drawn from the undisputed facts. Commissioner [of Internal Revenue] v. Scottish American Co., 323 U.S. 119, 65 S.Ct. 169, [89 L.Ed. 113]." Boehm v. Commissioner of Internal Revenue, 1945, 326 U.S. 287, 293, 66 S.Ct. 120, 124, 90 L.Ed. 78. But the record does not support the finding that the stock became worthless in 1948 rather than 1947. On the contrary, the only conclusion which can reasonably be drawn is that the stock had lost all value by December 31, 1947.

In arriving at its conclusion, the Tax Court relied on the corporate balance sheet as of December 31, 1947. The balance sheet figures do show that the stock had value, but the balance sheet on its face stated, "The amounts shown do not purport to represent the value of the assets in the event of liquidation." [8] The Tax Court stated, "It is argued that the book value of the assets was considerably in excess of their fair market value. In the absence of any appraisal or other evidence to establish the fair market value of the assets the book value constitutes the best evidence." This may be true. But the record contains uncontradicted testimony that on December 31, 1947, not only did the corporation lack any net worth, but that there was considerable doubt as to its ability to pay even its preferred creditors, and that no possibility of resuscitating the dying enterprise existed.

The major asset listed on the December 31 balance sheet was the corporation's inventory which accounted for over 75 per cent of the total listed assets. If the value stated for this inventory on the books was reduced by approximately 15 per cent, or less than one-sixth, the corporation would have lacked any net worth on the balance sheet.

Testimony by both the taxpayer and the disinterested trustee fixed the fair market value of these assets in December of 1947 at one-third to one-half the listed book value. Both of these witnesses were adequately qualified to give appraisals of the market value.[9] Both had been working for almost a year attempting to find new capital for the corporation and were familiar with the market value of the inventory, an important item in attracting new capital to a losing proposition. They testified, that because of the advent of television, the market for radio products was very bad and that by the latter part of 1947 the market for the corporation's products had completely collapsed; that no new capital could be found because of high administration, tax, and priority claims which made the risk of new capital very poor and attempts to find new capital were given up prior to the end of the year; that no sales were made after December 31; that the work staff had been cut to a very small group which was merely finishing work in process; and that the taxpayer, the disinterested trustee and the credi-

8. The balance sheet of the corporation on December 31, 1947, showed assets worth $539,478.17, of which $422,656.08 was the amount which represented the inventory. Liabilities were $475,270.02, and net worth was $64,208.15.

9. The taxpayer devoted approximately 15 years to the affairs of the corporation as president, manager, and member of the board of directors, and was familiar with the problems in the radio industry in 1947. The disinterested trustee devoted almost all his time to the corporation's affairs from the time of his appointment in February, 1947, to the corporation's liquidation. His opinions as to value came after approximately ten months of work with corporate affairs and attempts to formulate a plan of reorganization, which work placed him in an authoritative position as far as the value of the assets was concerned.

tors' committee had given up all hope for future operations by the end of the year. The disinterested trustee testified that he had informed the reorganization court in December of 1947 that not even one-half of the book value could be expected from all assets in the event of liquidation, and that he shortly thereafter moved that the company be adjudicated bankrupt.

 In stating that there was no appraisal or evidence of value, the Tax Court disregarded the positive and affirmative testimony of the taxpayer and the disinterested trustee. Their uncontradicted testimony was inherently believable. The short time interval between the end of 1947 and the final decision of the creditors on January 8, 1948, to liquidate the corporation, followed by the adjudication in bankruptcy on February 14, 1948, lends additional credence to their testimony. In such a situation, the Tax Court was bound to accept the testimony, which showed beyond doubt the stock's worthlessness in 1947. Chesapeake & Ohio R. Co. v. Martin, 1931, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983; Loesch & Green Construction Co. v. Commissioner of Internal Revenue, 6 Cir., 1954, 211 F.2d 210; Capitol-Barg Dry Cleaning Co. v. Commissioner of Internal Revenue, 6 Cir., 1942, 131 F.2d 712; Roberts Auto & Radio Supply Co. v. Dattle, 3 Cir., 1930, 44 F.2d 159.

The final point raised by the taxpayer is that the $29,000 loss qualifies to a limited extent as a net-operating loss which can be used for carry-back purposes, even though the loss be a non-business loss. We must reject the taxpayer's contention. The net-operating loss carry-over and carry-back provisions of the Code apply only to net-operating business losses. The issue has been well-considered by other courts, and we are in full accord with them. Lazier v. United States, 8 Cir., 1948, 170 F.2d 521; Guggenheimer v. Commissioner of Internal Revenue, 2 Cir., 1954, 209 F.2d 362; Appleby v. United States, 1953, 116 F.Supp. 410, 127 Ct.Cl. 91; cf. Dalton v.

Bowers, 1932, 287 U.S. 404, 408, 53 S.Ct. 205, 77 L.Ed. 389.

For the foregoing reasons, the decision of the Tax Court will be reversed and the cause remanded for a redetermination of deficiencies in proceedings not inconsistent with this opinion.