JOSEPH LORCH AND HANNAH LORCH, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MICHAEL T. HARGES AND JANET G. HARGES, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5315–75, 9654–75.    Filed August 15, 1978.

*Leonard Bailin,* for the petitioners.
*L. William Fishman,* for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Taxpayer | Year | Deficiency |
| --- | --- | --- |
| Joseph Lorch and Hannah Lorch........ | 1970 | $61,134.00 |
| Michael T. Harges and | | |
| Janet G. Harges ........................... | 1970 | 35,650.13 |
| | 1971 | 1,079.00 |

The sole issues for decision are the extent to which petitioners sustained deductible losses in 1970 and the nature of any such losses, i.e., capital or ordinary.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference.

Joseph Lorch (Lorch) and Hannah Lorch were legal residents of New York, N.Y., and Michael T. Harges (Harges) and Janet G. Harges were legal residents of New Canaan, Conn., at the time the petitions herein were filed. Each couple filed joint Federal income tax returns for the taxable years at issue. The respective wives are parties to this proceeding only by virtue of having joined in filing such returns.

On January 2, 1962, Lorch and Harges (hereinafter referred to as petitioners) entered into arrangements with Hayden, Stone & Co., Inc. (Hayden Stone), whereby each agreed to deposit cash and securities in an account with Hayden Stone and to subordinate his rights to these assets, which were placed in a "subordinated" account. Each of them also delivered to Hayden Stone a non-interest-bearing promissory note for $100,000, on which his liability was expressly limited to the assets in his subordinated account.

Hayden Stone was required to notify each petitioner before it could sell the assets in the subordinated account. Upon notification from Hayden Stone, each petitioner had the option of substituting cash and/or securities equal in value to the subordinated account assets or permitting such assets to be liquidated.

At such time as his account was liquidated, each of the petitioners was to be entitled to receive a 6-percent subordinated debenture from Hayden Stone in the principal amount equal to the amount paid on his indebtedness represented by his note. Pending the issuance of the subordinated debenture, he would have the rights of a "subordinated lender."

Subject to the above, each petitioner maintained virtually full legal and beneficial ownership of the assets in his account. In particular, he retained the benefit of any increases and bore the risk of any decreases in value, the right to vote or consent with respect to securities, the sole right to any income therefrom or distributions thereon, and the obligation to pay all taxes imposed on the income so derived. Each petitioner could sell the securities or use any cash in his account to purchase securities, provided that the net proceeds of the sale and the securities so purchased

were to be retained in the account. He also could replace any security with cash or securities of no lesser value.

Each petitioner had the right to terminate the arrangement by giving 6 months' written notice. If, during this 6-month period, Hayden Stone notified him that the assets contained in the account were to be liquidated, the arrangement would not be terminated.

These arrangements helped Hayden Stone satisfy the minimal capital requirements as set forth in rule 325 of the New York Stock Exchange and rule 466 of the American Stock Exchange. Lorch and Harges were each to be paid annually 5 percent of his indebtedness, i.e., $100,000.

On June 26, 1970, Hayden Stone was in financial difficulty. It demanded payment from each petitioner of his note and stated that, if not paid, the collateral would be liquidated. Lorch then deposited $10,000 with Hayden Stone. Dividends, interest, and a preexisting credit balance, amounting in the aggregate to $1,074.75, were retained by Hayden Stone and this amount was credited to Lorch's account. Except for some common stock subsequently returned to him, Lorch permitted Hayden Stone to liquidate his subordinated account securities, for which it received $80,026.84. Lorch's cost basis in the securities sold was $126,005.51. Each security was sold for less than its cost. The total amount used to satisfy his obligation to Hayden Stone was $91,101.59.

Upon receiving notice from Hayden Stone, Harges paid, or caused to be paid to Hayden Stone on his behalf, $66,862.05. Hayden Stone retained interest and dividend income, aggregating $2,269.70, and credited this amount to Harges. Hayden Stone was permitted by Harges to liquidate one bond, for which it received $19,460.73. Harges' cost basis in this bond was $20,000. Hayden Stone returned the remainder of Harges' securities to him. The total amount used to satisfy Harges' obligation to Hayden Stone was $88,592.48.

On September 4, 1970, Cogan, Berlind, Weill & Levitt, Inc. (CBWL) and Hayden Stone entered into an agreement whereby CBWL agreed to purchase certain assets (including use of the name Hayden Stone) and to assume certain liabilities of Hayden Stone. The agreement required that all of the subordinated creditors of Hayden Stone, including petitioners, consent to the transaction and agree to withhold the exercise of any claims

against Hayden Stone. These creditors were told that, unless they consented, they would receive nothing on their claims. Of the 108 subordinated creditors, 107, including petitioners, consented, and the agreement was consummated.

In order to replace a negative net worth of $5,474,010 as of July 31, 1970, with a positive net worth of $25,827,832 and to reduce the possibility of H.S.E. (to which Hayden Stone's name would be changed) being placed in liquidation under court supervision, it was proposed that the subordinated lenders accept preferred stock in satisfaction of their claims against Hayden Stone.

Under the terms of the proposal, Lorch and Harges each agreed to accept 1 share of $6 senior voting preferred stock of H.S.E. ($100 liquidating value) for each $100 of claims. On September 10, 1970, Lorch received 911.01 shares and Harges received 885.92 shares. At the time of receipt, the preferred stock had a value of $20 per share. As of the time of trial, petitioners had not sold their preferred stock in H.S.E.

It was anticipated that H.S.E. would dispose of its remaining assets and pay all unassumed liabilities but would not otherwise engage in business.

Neither Lorch nor Harges was ever an employee, officer, director, or stockholder of Hayden Stone, nor have they ever been in the business of buying, selling, or trading securities.

The petitioners claimed deductions under section 165(c)(2)[1] in the amount by which their bases in the securities held by Hayden Stone exceeded the fair market value of the H.S.E. preferred stock received. In the notice of deficiency in docket No. 5315–75 (Lorch), respondent determined that the deductible losses were limited to the excess of Lorch's bases in the liquidated securities over the amount realized by Hayden Stone on their sale and should be treated as capital losses. In the notice of deficiency in docket No. 9654–75 (Harges), respondent disallowed the entire claimed deduction on the ground that no deductible loss had been established and, alternatively, that, if any deductible loss occurred, it was not an ordinary loss.

---

[1]All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.

OPINION

Petitioners urge that we take a unitary view of their arrangements with Hayden Stone and that, accordingly, they sustained losses measured by the difference between their cost of the securities held in the subordinated accounts (including the securities returned to them) and the fair market value of the preferred shares of H.S.E. which they received. Such losses, they contend, should be held to be ordinary losses incurred in a transaction entered into for profit under section 165(c)(2)[2] and therefore deductible in full. Respondent counters that there were two parts to the 1970 implementation of the arrangements between petitioners and Hayden Stone: (a) the sale of the securities held in the subordinated accounts by Hayden Stone as petitioners' agent and for their account, with resultant capital losses in accordance with the limitation of section 165(f) (see n. 2 *supra*) measured by the excess of petitioners' bases in the securities sold over the amount realized on their sale and (b) the acquisition of the H.S.E. preferred shares in exchange for petitioners' claims against Hayden Stone, including their rights to receive subordinated debentures, as to which no loss should be recognized in 1970 because the shares were received in a reorganization which constituted a recapitalization within the meaning of section 368(a)(1)(E). For the reasons hereinafter set forth, we agree with respondent.

Initially, we dismiss, as being without merit, petitioners' argument that the cost of the securities in the subordinated accounts, which were returned to them by Hayden Stone, should be included in the measure of any loss which they may have sustained. They simply received back securities which belonged to them. The fact that they paid certain amounts in cash to

---

[2]Sec. 165 provided in pertinent part as follows:

SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \* \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

\* \* \* \* \* \* \*

(f) CAPITAL LOSSES.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.

Hayden Stone does not require a contrary conclusion. The amounts of cash were paid by way of substitution of collateral pursuant to their arrangements with Hayden Stone. To the extent that they sustained losses beyond those resulting from the sale of their securities, such amounts of cash are includable in the measure of such losses.

We also note at the outset that the parties are in agreement that the petitioners entered into the arrangements with Hayden Stone in the hope and expectation of profit. But, as we stated in *Siple v. Commissioner*, 54 T.C. 1, 10 (1970), "While the existence of a profit motive is obviously a necessary element, it is not in and of itself a ticket for an ordinary loss deduction under section 165(c)(2) without regard to section 165(f)."

We think it cannot be gainsaid that petitioners remained the owners of the deposited securities from the inception of their arrangements with Hayden Stone until the securities were sold. They retained all the rights of ownership throughout that period. In substance, Hayden Stone was petitioners' bailee. See *Miami National Bank v. Commissioner*, 67 T.C. 793, 800–801 (1977); *In re Bradford's Estate*, 165 Misc. 520, 300 N.Y.S. 92 (Sullivan County Surr. Ct. 1937).[3] As a result, the sale of those securities by Hayden Stone was for their account and they are required to recognize the losses from such sales as if the sales had been made by them directly. Unquestionably, the securities were capital assets in the hands of petitioners and the losses sustained on their sale, measured by the difference between their cost and the sales price, were consequently capital losses subject to the limitation of section 165(f).

The question remains as to whether petitioners suffered further loss upon the disposition of the proceeds of the sales and of the additional cash which petitioners furnished Hayden Stone pursuant to the arrangements. Petitioners in effect claim that their arrangements with Hayden Stone continued to partake of the character of a bailment and that their losses became deductible under section 165 at the point of time when they were "sold out," relying on *Stahl v. United States*, 441 F.2d 999 (D.C. Cir. 1970), affg. 294 F. Supp. 243 (D.D.C. 1969), and *Michtom v. United States*, 216 Ct. Cl. , 573 F.2d 58 (1978). See pp. 682–683

---

[3]Compare *Clyman v. Commissioner*, T.C. Memo. 1977–200.

*infra.* We think petitioners' view of the arrangements ignores the fact that they had the right to receive subordinated debentures, which they exchanged for preferred stock, and the consequences flowing therefrom.

One way to view the arrangements is that petitioners either used their cash to acquire subordinated debentures, or the preferred stock in lieu thereof, pursuant to their previously undertaken obligation. Although the value of that property had declined and they "parted with more than they received,"[4] no loss would be deductible until the property acquired was disposed of in a taxable transaction. Cf. *Loewi & Co. v. Commissioner*, 23 T.C. 486, 493 (1954), affd. 232 F.2d 621 (7th Cir. 1956). See also *Jordan v. Commissioner*, 60 T.C. 872, 879 (1973), affd. per curiam 514 F.2d 1209 (8th Cir. 1975). In this connection, we note that there is nothing in this record to indicate that petitioners' rights to the debentures were without value at the time of the exchange so that petitioners might be considered to have suffered a bad debt loss separate and apart from the exchange. Cf. *Mitchell v. Commissioner*, 187 F.2d 706 (2d Cir. 1951), revg. and remanding 13 T.C. 368 (1949); *Levine v. Commissioner*, 31 T.C. 1121 (1959).[5] Nor is it significant that the debentures were apparently never issued by Hayden Stone. Petitioners' rights to the debentures can be treated as the equivalent of the debentures themselves for the purposes of this case. Cf. *Gawler v. Commissioner*, 60 T.C. 647 (1973), affd. per curiam 504 F.2d 425 (4th Cir. 1974).

Another and perhaps more realistic approach is to look to the exchange by petitioners of their rights to receive subordinated debentures for preferred stock. The critical question then arises whether the exchange of the rights to the debentures for the preferred stock was pursuant to a recapitalization under section 368(a)(1)(E) so that no loss should be recognized by virtue of section 354(a). Petitioners seek to avoid the characterization of a recapitalization by arguing that H.S.E. was in the process of

---

[4]The debentures to which petitioners were entitled were to have been issued on a dollar-for-dollar face value basis. The preferred stock was issued on the same basis but had an actual value of only 20 percent of face at the time of issuance.

[5]See also *IDI Management, Inc. v. Commissioner*, T.C. Memo. 1977–369. In any event, petitioners rely only on sec. 165 and make no contention that they are entitled to either a business or nonbusiness bad debt loss under sec. 166.

liquidation and that consequently the requirement of "business purpose" has not been satisfied.[6]

Neither the Code nor the regulations define the term "recapitalization." In general terms, it is a "reshuffling of a capital structure within the framework of an existing corporation." *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 202 (1942). In *Commissioner v. Neustadt's Trust*, 131 F.2d 528, 530 (2d Cir. 1942), affg. 43 B.T.A. 848 (1941), the court stated that "recapitalization" should be broadly construed to satisfy dual congressional purposes, i.e., "to encourage legitimate reorganizations required to strengthen the financial condition of a corporation, and to prevent losses being established by bondholders, as well as stockholders, who have received the new securities without substantially changing their original investment." Section 1.368–2(e)(1), Income Tax Regs., gives the exchange of bonds for preferred stock as an example of a recapitalization.

In the instant case, petitioners acquired voting rights in H.S.E. and they became stockholders in, rather than creditors of, H.S.E. In terms of their claim to the assets of H.S.E., the switch from subordinated creditors to senior stockholders had virtually no substantive effect. Except for the change in voting rights, their stake in H.S.E. was not affected. There simply was no "substantial change" in petitioners' investment and, under the second element of the standard set forth in *Commissioner v. Neustadt's Trust, supra,* gain or loss should not be recognized. See also *Hickok v. Commissioner,* 32 T.C. 80 (1959).

Moreover, we think that, unlike *Graham v. Commissioner,* 37 B.T.A. 623, 630 (1938), upon which petitioners also rely,[7] the business purpose test has been satisfied in the instant case. The issuance of the preferred stock was undertaken to reduce H.S.E.'s debt and increase its equity on its financial statement, thereby reducing the possibility of H.S.E. being placed in liquidation under court supervision. Although H.S.E. was to sell its assets and repay its outstanding liabilities, the recapitalization was not merely one step in a liquidation masquerading as a reorganization. There is simply no basis for arguing "that this

---

[6]Petitioners do not argue that the prerequisites of recapitalization are not satisfied for any other reason, nor do they dispute respondent's contention that, if there is a recapitalization, no loss is recognized pursuant to sec. 354(a).

[7]See also *Standard Realization Co. v. Commissioner,* 10 T.C. 708, 715 (1948).

transaction was a shield for a distribution of dividends or for some other improper purpose." See *Kaufman v. Commissioner*, 55 T.C. 1046, 1054 (1971). See also *Bazley v. Commissioner*, 331 U.S. 737 (1947); *Commissioner v. Capento Securities Corp.*, 140 F.2d 382 (1st Cir. 1944), affg. 47 B.T.A 691 (1942); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.51 (3d ed. 1971). We conclude that there was a recapitalization for purposes of section 368(a)(1)(E) and that no loss should be recognized.[8]

We recognize that our analysis and conclusions differ from those articulated in *Stahl v. United States*, 441 F.2d 999 (D.C. Cir. 1970), affg. 294 F. Supp. 243 (D.D.C. 1969), and *Michtom v. United States*, 216 Ct. Cl. , 573 F.2d 58 (1978), both of which involved arrangements whereby securities were loaned under a subordination agreement for the purpose of improving the capital position of the borrower in return for the payment of compensation therefor. However, for reasons hereinafter set forth, we consider *Stahl* distinguishable and that we should not follow *Michtom* to the extent that it may be said to apply to the instant case.

In *Stahl*, the only issue was whether the taxpayer's loss, measured by her cost of the securities which had been sold by a brokerage firm to whom she had loaned the securities, was limited by the provisions of section 166 governing deductions for bad debts. The proceeds of sales exceeded the taxpayer's cost so that, in point of fact, there was a gain realized. The Government did not seek to tax the gain, presumably because the taxpayer would have been entitled to an offsetting loss. The taxpayer did not seek to claim the benefits of long-term capital gain treatment on the excess of the sale proceeds over her cost and then claim an increased ordinary loss. See *Santa Anita Consolidated, Inc. v. Commissioner*, 50 T.C. 536, 561–562 (1968), and cases cited thereat. Consequently, the court was not asked to decide whether there were separate transactions, rather than one, and to deal with the question of separate tax treatment of such sales. It therefore focussed only on the second aspect of the situation, namely, the nature of the taxpayer's loss from her failure to receive her securities from the brokerage firm. Under

---

[8]The respondent raised the recapitalization issue by way of an amendment to his answer, so the burden of proof was upon him with respect to the factual underpinning of his legal position. See Rule 142(a), Tax Court Rules of Practice and Procedure. We are satisfied that he has carried such burden.

her agreement, the taxpayer's only right was to have her securities returned to her, except to the extent that they were needed by the firm. The District Court and the Court of Appeals found that the arrangement constituted a bailment throughout (a characterization which we have adopted herein up to and including the sale of the securities which petitioners delivered to Hayden Stone)[9] rather than a debtor-creditor relationship and that accordingly the provisions of section 166 were inapplicable. Unlike the instant case, where petitioners were entitled to receive subordinated debentures in the event that their securities were sold, the taxpayer in *Stahl* had no right to receive, nor did she receive, anything from the brokerage firm except damages for breach of the bailee's obligation to her. *Stahl* is therefore clearly distinguishable.[10]

In *Michtom v. United States, supra,* the taxpayer also loaned his securities to Hayden Stone under arrangements similar to those involved herein. The Court of Claims ignored the Government's assertion that the arrangements should be viewed as involving separate transactions between the taxpayer and Hayden Stone and took a unitary view of those arrangements. It then proceeded to hold that the taxpayer incurred a deductible ordinary loss in 1970 measured by the difference between the basis of the securities sold and the market value of the preferred stock of H.S.E. which the taxpayer received. We do not understand the failure of the Court of Claims to treat the sales of the taxpayer's securities as a separate transaction and, in any event, disagree with its opinion to the extent that it can be said to hold that such sales should not be so treated. See discussion at p. 679 *supra.* With respect to the exchange, whereby the taxpayer received H.S.E. preferred stock for his subordinated claim against Hayden Stone, we note that the Government did not argue that this was pursuant to a recapitalization, as the respondent has urged herein. Thus, that issue was not before the Court of Claims and *Michtom* is therefore distinguishable from the instant case in respect of the treatment of petitioners' losses on their exchanges.[11]

---

[9]The bailment characterization, in any event, would not include the additional cash which petitioners paid to Hayden Stone. See *Clyman v. Commissioner, supra.*

[10]The same reasoning distinguishes *Ansley v. Commissioner,* 217 F.2d 252 (3d Cir. 1954), revg. on this issue a Memorandum Opinion of this Court. Compare *Sitterding v. Commissioner,* 20 T.C. 130 (1953); *Copley v. Commissioner,* T.C. Memo. 1968–77.

[11]The Court of Claims stated in *Michtom v. United States,* 216 Ct. Cl. , 573 F.2d 58 (1978), that the

In sum, we hold that petitioners' losses in 1970 should be limited to the excess of the bases in their securities over the amount realized by Hayden Stone on the sales thereof for their accounts. In view of our holding that any deduction for a further loss is precluded by the reorganization provisions of the Code, we do not reach the alternative argument of the respondent that, to the extent that any such loss occurred, it would be a nonbusiness bad debt loss whose deductibility would be governed by section 166.

> *Decision will be entered for the respondent in docket No. 5315–75.*

> *Decision will be entered under Rule 155 in docket No. 9654–75.*

Reviewed by the Court.

---

taxpayer's rights against Hayden Stone "were not a capital asset, for they lacked an essential characteristic of capital assets—the ability to appreciate or depreciate in value over a period of time." We think that this statement is open to question. Sec. 1221 defines capital assets as "property" with certain specified exceptions. Nothing in that section speaks to the ability of the property to fluctuate in value. The rights of the taxpayer in *Michtom*, as well as the rights of petitioners herein, are clearly "property" and equally clearly they do not fall within any of the exceptions contained in sec. 1221. A promissory note can be a capital asset. See *Estate of Lehr v. Commissioner*, 18 T.C. 373 (1952); *Ardela, Inc. v. Commissioner*, T.C. Memo. 1969-83. In any event, the value of the bundle of rights in the subordinated agreements of the taxpayer in *Michtom* and of petitioners herein would be affected by changes in the prevailing interest rates and shifts in the business fortunes of Hayden Stone (even in liquidation).