WILLIAM D. RICHARDS AND VERNA V. RICHARDS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Richards v. Commissioner
Docket No. 4821-75.
United States Tax Court
T.C. Memo 1976-380; 1976 Tax Ct. Memo LEXIS 21; 35 T.C.M. (CCH) 1709; T.C.M. (RIA) 760380; December 13, 1976, Filed *21 Held, although petitioner's stock sustained a severe shrinkage in value for the year in issue, petitioner failed to sustain his burden of proving the elements necessary to establish worthlessness. George L. Damoose, for the petitioners. Emory L. Langdow and Jeffrey C. Kahn, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined a deficiency in petitioners' federal income tax for the calendar year 1970 in the amount of $62,308.90. Due to concessions, the sole remaining issue is whether petitioners' stock in Food Baron Corporation became worthless within the meaning of section 165(g)(1), I.R.C., 1954 during the taxable year at issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found.The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, William D. Richards and Verna V. Richards, husband and wife, resided in La Mesa, California at the time the petition herein was filed. Their joint federal income tax return for the calendar year 1970 was prepared on the cash receipts and disbursements method and filed with the District Director, Internal *22 Revenue Service, Los Angeles, California.Verna V. Richards is a party to the proceeding only because she joined in the filing of this return, and, accordingly, William D. Richards will hereinafter be referred to as petitioner. On October 18, 1968, Food Baron Corporation (hereinafter FB) was incorporated under the laws of the State of Nevada. Petitioner contributed $200,000 to FB in exchange for 200,000 shares of FB common stock. [1] *24 Such stock was a capital asset in the hands of petitioner. FB adopted a fiscal year ending September 30, and the balance sheets (schedule L) attached to the U.S. corporation income tax return (form 1120) for its taxable years ended September 30, 1970, through September 30, 1975, [2] show the following assets, liabilities, and shareholders' equity: YEAR ENDED 9-30:
1970
1971
1972
ASSETS: Cash
$ 112.50
$ 507,562.28
$ 247,707.01
Trade notes & Accounts
74,760.95
74,409.16
77,253.14
[3] Receivable Less: Allowance for bad debts
(7,652.11)
(22,652.11)
(10,949.74)
[4] Other current assets 925,000.00
1,793.75
4,985.81
Loans to stockholders
-0-
-0-
378,350.00
[5] Other investments 791,619.24
789,619.24
-0-
Intangible assets (organization
3,235.50
3,235.50
3,235.50
costs)
Less: Accumulated amortization
(1,151.30)
(1,798.40)
(2,445.50)
Other assets (prior employee
18,807.57
18,723.12
2,122.51
receivables)
TOTAL ASSETS
$1,804,732.35
$1,370,892.54
$ 700,258.73
LIABILITIES & STOCKHOLDERS'
EQUITY
Accounts Payable
$ 56,247.79
$ 27,307.12
$ 2,619.91
Mortgages, notes, bonds payable
1,286,200.00
685,000.00
535,000.00
in less than 1 year
Mortgages, notes, bonds payable
-0-
340,000.00
255,000.00
in 1 year or more
Other current liabilities
9,926.83
-0-
-0-
Capital stock - common
1,000,000.00
1,000,000.00
1,000,000.00
Retained earnings -
(544,642.27)
(678,414.58)
(1,089,361.18)
unappropriated
Less: cost of treasury stock
(3,000.00)
(3,000.00)
(3,000.00)
TOTAL LIABILITIES &
$1,804,732.35
$1,370,892.54
$ 700,258.73
STOCKHOLDER'S EQUITY
*23 YEAR ENDED 9-30: 1973
1974
1975
ASSETS: Cash
$ 54,336.72
$ 267.23
$ 267.23
Trade notes & Accounts
-0-
-0-
-0-
[3] Receivable Less: Allowance for bad debts
-0-
-0-
-0-
[4] Other current assets 4,985.81
4,985.81
4,985.81
Loans to stockholders
632,946.04$698
680,000.00
0,746.04
[5] Other investments -0-
-0-
-0-
Intangible assets (organization
3,235.50
-0-
3,235.50
costs)
Less: Accumulated amortization
(3,092.60)
-0-
(3,235.50)
Other assets (prior employee
-0-
-0-
-0-
receivables)
TOTAL ASSETS
$ 692,411.47
$ 685,999.08
$ 685,253.04
LIABILITIES & STOCKHOLDERS'
EQUITY
Accounts Payable
$ 473.93
$ 2,361.69
$ 2,687.69
Mortgages, notes, bonds payable
535,000.00
535,000.00
535,000.00
in less than 1 year
Mortgages, notes, bonds payable
170,000.00
85,000.00
-0-
in 1 year or more
Other current liabilities
-0-
-0-
-0-
Capital stock - common
1,000,000.00
1,000,000.00
1,000,000.00
Retained earnings -
(1,010,062.46)
(933,362.61)
(849,434.65)
unappropriated
Less: cost of treasury stock
(3,000.00)
(3,000.00)
(3,000.00)
TOTAL LIABILITIES &
$ 692,411.47
$ 685,999.08
$ 685,253.04
STOCKHOLDER'S EQUITY
Hence, computation of FB's net asset position per Schedule L of its income tax return for the above year is: YEAR ENDED 9-30: 1970
1971
1972
NET ASSETS:
$452,357.73
$318,585.42
($92,361.18)
1973
1974
1975
NET ASSETS:
($13,062.46)
$ 63,637.39
$147,565.35 Prior to June 23, 1970 FB acquired a franchise from Kentucky Fried Chicken Corporation (Hereinafter KFC), a Delaware corporation, to build, own and operate Kentucky Roast Beef outlets, a form of fast-food service. A vast majority of these outlets became unprofitable within 90 *25 days of opening. By letter agreement of June 23, 1970 FB agreed to sell to KFC all of its interest in the Kentucky Roast Beef operations and certain other assets (including 50 percent of the capital stock of Kentucky Baron of California, Inc. and Kentucky Baron of Florida, Inc., [6] *26 the other 50 percent of each was owned by KFC already) for a total purchase price of $1,350,000, payable as follows: (a) $500,000 in cash on October 1, 1970. (b) On April 1, 1971, $425,000.00 in cash, or, at the option of KFC (exercisable only if the KFC stock then had a market value of $5.00 per share or more), unregistered KFC common stock equivalent in value to $425,000.00 (based upon the New York Stock Exchange closing price on the last trading day preceding March 20, 1971). (c) On October 1, 1971, $425,000.00 in cash, or, at the option of KFC (exercisable only if KFC stock then had a market value of $5.00 per share or more), unregistered KFC common stock equivalent in value to $425,000.00 (based upon the New York Stock Exchange closing price on the last trading day preceding September 19, 1971). In addition, the agreement provided that Louis C. Hutchinson, president of FB, agreed not to compete with KFC in its Kentucky Roast Beef or H. Salt Fish & Chips operations for a three-year period beginning on June 23, 1970. KFC paid FB $500,000 in cash on November 2, 1970. Pursuant to the terms of the June 23, 1970 agreement, the payment was due October 1, 1970. On the same date (June 23, 1970), KFC entered into an employment arrangement with petitioner [7] and certain other key employees of FB, effective as of the closing of the sale between FB and KFC, to operate the business being sold to KFC. Substantial disputes between KFC and FB arose late in 1970, and there were in December of 1970 serious doubts in the minds of FB management that FB would ever be paid the balance of the purchase price due from KFC. In fact, the $500,000 payment of November 2, 1970 was made only after substantial adversary discussions and FB's threat to sue if KFC did not perform under the June 23, 1970 agreement. On March 19, 1971, *27 the aforenoted agreement was amended as follows: The parties agreed to reduce the purchase price to $925,000. KFC also agreed to pay the balance of the $925,000, $425,000 in cash to FB on April 1, 1971. [8] Under the March 19, 1971 letter agreement, FB and its key employees [9] also entered into a covenant not to compete with KFC, its subsidiaries, affiliates or franchises for a period of five years commencing on March 19, 1971. In consideration for the covenant, KFC agreed to pay FB $425,000, without interest, in five equal annual installments of $85,000 commencing on March 19, 1972. KFC reserved the right to refuse further payments in addition to seeking injunctive relief in the event of any violation of the covenant. About the time of the payment of the $500,000 by KFC on November 2, 1970, FB became aware that Heublein, Inc. (hereinafter Heublein) was interested in buying the KFC operation. On or around August 5, 1971 Heublein, which had previously acquired KFC, loaned FB $425,000, without interest, repayable in five equal installments *28 on the nineteenth of March 1972 through 1976, respectively. Under the terms of the loan, payments coming due to FB under its March 19, 1971 agreement with KFC could be offset, without notice to FB, against installments coming due under this loan. [10]
In March or April of 1970 [11] FB loaned one Bill Bailey $50,000 to start Telemart Enterprises, Inc. (hereinafter Telemart) in eturn for which Bailey gave FB an option to purchase a controlling interest in Telemart. The Telemart concept was a large facility to house retail items, most of which are commonly sold in supermarkets. Shoppers would call in their orders to a "talking computer" which would inform the customer of the price of each item ordered, print out the entire order in a preprogrammed manner and select the most efficient truck routing for delivery of goods to the customer. Theoretically the shopper would get delivery of his or her groceries the day the order was placed or the next morning. FB exercised its option to purchase the Telemart shares and on April 4, 1970 entered into an agreement with Telemart and Bailey. Upon consummation of such *29 agreement, FB owned 395,000 shares (79 percent) and Bailey owned 105,000 shares (21 percent) of the outstanding Telemart stock. Also, contemplated by this agreement was the issuance and sale to the general public by Telemart of an additional 250,000 shares. In connection with the agreement and proposed public offering and pursuant to the requirements of the California Commissioner of Corporations, the number of Telemart shares outstanding prior to the public offering was to be reduced in the event that Telemart failed to have net after-tax earnings of $300,000 for calendar 1971. [12] On May 22, 1970 Pueblo International, Inc. (hereinafter Pueblo), a Delaware corporation, *30 and FB entered into a purchase agreement providing that FB would sell to Pueblo its entire holdings in Telemart. [13] The purchase price for all the shares of common stock of Telemart was to be payable only in shares of common stock of Pueblo. As a result of the agreements between Bailey and FB (and the requirements of the Commissioner of Corporations), 280,000 of FB's Telemart shares (the soft shares) were subject to the cancellation provisions described herein. For the 115,000 shares of Telemart which were not subject to cancellation (the hard shares), Pueblo was to deliver shares of its common stock in an amount equal to $575,000 or $5.00 per share. For the 280,000 soft shares which were subject to cancellation, Pueblo was to deliver Pueblo stock valued in an amount equal to $112,700. Thus, the total maximum consideration for the Telemart stock was $687,700. [14] *31 The purchase agreement required that Pueblo use its best efforts to register immediately after the closing the Pueblo shares given in exchange for the Telemart stock at the closing. These Pueblo shares were to be valued at the average closing price of Pueblo stock on the New York Stock Exchange during the ten trading days immediately preceding the effective date of the registration statement referred to above.At the closing on July 15, 1970, Pueblo delivered 34,385 shares of its common stock to FB in exchange for 395,000 shares of Telemart. Under the agreement, additional shares of Pueblo stock were to be transferred to FB at the time the Pueblo stock was registered, so that the aggregate value of Pueblo stock received by FB (before payment of any additional contingent shares) would be as previously stated, $687,700. In connection with the sale of Telemart stock, FB delivered to Pueblo an offering circular *32 that had been prepared for distribution to California residents in connection with an offering of Telemart's stock within California. Moreover, paragraph 15 of the agreement between the parties contained an indemnification clause whereby FB agreed to indemnify and hold Pueblo harmless from and against any and all loss, liability and damage to Pueblo or Telemart arising out of any misrepresentation, breach of warranty, unfulfillment of any covenant or agreement on the part of FB or for any misrepresentation in or omission from the offering circular or other documents furnished to Pueblo by FB under or pursuant to the agreement, and all actions, suits, proceedings, demands, assessments, judgments, costs and expenses, including reasonable legal fees, incident thereto. Telemart was placed into bankruptcy by Pueblo in September of 1970, thirteen days after it commenced business. Pueblo refused to register the stock it had transferred to FB in exchange for the Telemart stock, and it refused to transfer the required additional stock [15] *33 (to yield an aggregate purchase price in Pueblo stock of $687,700) to FB. On November 9, 1970, Pueblo filed suit against FB in United States District Court, Southern District of California. The underlying basis of the complaint filed by Pueblo was that the offering circular it received from FB was misleading in that it misrepresented material facts and omitted to state other material facts. Under the terms of the written agreement between Pueblo and FB, Pueblo could rescind if there was a single material misrepresentation or omission from the offerng circular. Moreover, in the opinion of FB's legal counsel (an expert in securities litigation), under the leading decisions in the Court of Appeals for the Ninth Circuit, controlling in the lawsuit filed by Pueblo in December 1970, it was only necessary to establish a single material misrepresentation or omission set forth and claimed under Rule 10b-5 of the Securities Exchange Act of 1934. [16] *34 The complaint sought rescission of the exchange of the Telemart stock for the Pueblo stock and additional damages in excess of $450,000. The critical issues to be resolved in the lawsuit, upon which the liability of FB turned, were whether the offering circular was misleading and whether Pueblo assumed the risk that the offering circular was misleading despite the covenant by FB in the written agreement to the effect that it was not. As of December 1970, counsel for FB believed that Pueblo and its attorneys were very familiar with the reasons for Telemart's failure when they filed the Pueblo complaint. Therefore FB's counsel believed the best defense [17] to this action was to establish that Pueblo had made its own analysis and that, despite the covenant by FB in its agreement, the representations in the aforesaid offering circular had not been relied upon by Pueblo, but *35 that Pueblo had accepted the risk that the offering circular was not entirely accurate. On or about May 1971, FB's counsel, through the pretrial discovery process, obtained sufficient evidence to establish this defense and obtain a favorable settlement in September of 1971. In addition to the potential direct liability to Pueblo arising out of the Telemart failure, FB had a continuing liability to Pueblo for any damages Pueblo might suffer as a result of lawsuits against it by persons injured as a result of the failure of Telemart. If, as the complaint filed by Pueblo alleged, the offering circular distributed by Telemart in connection with its offering was in fact misleading, FB had potential liability to all other purchasers of Telemart stock. This potential liability was in excess of $700,000. In December of 1970, it appeared to petitioner, counsel for FB and the others involved, that there were good grounds for the filing of such action, in the immediate future and that FB would be held liable in the event of such an action. The class action anticipated was filed *36 in June of 1971, [18] and it sought $760,000 in compensatory damages. In December of 1971, Pueblo, FB and the plaintiffs in the class action settled the two lawsuits which were filed and described above. Under the terms of the settlements, FB returned all of the Pueblo stock it held to Pueblo, FB received $326,000 in cash from Pueblo on March 8, 1972, and the plaintiffs in the class action received $215,000 from Pueblo to be distributed to the class, less attorney's fees and disbursements. The release executed by Pueblo and FB in connection with this settlement extended to all claims against each other arising out of the purchase and sale of the Telemart stock. Furthermore, FB faced liabilities to additional parties claiming injuries as a result of the Telemart endeavor. Subsequently, Rapistan Corporation filed suit against FB for $150,000 damages arising out of the Telemart problem. That suit has not yet come to trial. As of December 31, 1970 FB had also been sued for past due rent on the lease of the Telemart premises which it guaranteed. As *37 of December 1973 there were still active threats of additional lawsuits against FB out of the Telemart failure. As of December 31, 1970 FB was the guarantor to Security Pacific National Bank of certain obligations of petitioner and other key employees of FB in the principal amount of $38,038.81 plus interest thereon. FB's 34,385 [19] shares of Pueblo stock and its KFC contract rights under the June 23, 1970 FB-KFC agreement as amended were pledged to secure such guarantee. Conversely, in the latter part of 1970 and subsequent thereto, the major shareholders in FB (including petitioner) loaned their personal funds to the corporation to keep it functioning and to pay the legal expenses incurred in connection with the KFC and Pueblo matters.These same shareholders were required as of 1970 to guarantee, personally, all FB liabilities. In May of 1970 petitioner had outstanding four loans from Southern California First National Bank with an aggregate unpaid *38 balance of $470,000. On May 12, 1970 petitioner was advised by the bank that this loan balance was inadequately secured. It was secured by KFC stock owned by petitioner, but the decline in the market price of that stock rendered that security inadequate. On September 18, 1970 the regional vice president of the bank wrote petitioner demanding payment of an amount sufficient to reduce the outstanding balance of the loans due to not more than 70 percent of the market value of the KFC stock held by the bank as collateral. That letter also advised petitioner that, if necessary reduction or collateral deposit was not accomplished by September 25, 1970, the bank would proceed to liquidate the indebtedness by sale of the collateral on the open market. On May 12, 1970 petitioner had deposited 125,000 shares of FB stock with the bank in an attempt to increase the collateral. On October 16, 1970 and on November 6, 1970, petitioner received letters from the bank advising him that the bank had received the proceeds from a sale of his KFC stock. [20] The proceeds of the sales were applied to the principal and interest payments of the four loans petitioner had outstanding, reducing the loan balances *39 outstanding to zero. As of December 31, 1970 FB's books showed the following assets and liabilities: ASSETS: Cash
$ 79.06
Trade Receivables (Net) - KFC
66,652.72
Other Current Assets
425,000.00
Other Investments
Pueblo, Int'l Stock
687,700.00
Bill Bailey Communications
101,919.24
Intangibles (Net)
1,924.33
Prior Employee Receivables
18,807.57
TOTAL ASSETS
$1,302,082.92
LIABILITIES: Accounts Payable
$ 18,902.94
Mtg. Notes Payable -
less than 1 year
822,803.06
Other Current Liabilities
7,630.02
TOTAL LIABILITIES
$ 849,336.02
Excess of Assets over Liabilities
$ 452,746.90 FB's ongoing business operations terminated after September 30, 1970. From that point on, its activities consisted of defense of the aforesaid lawsuits and ongoing discussions with its creditors and debtors for collection and payment of monies owing and owed. The approximate $502,00 decrease in FB's assets and liabilities for the period September 30, 1970 through December 31, 1970 is the result of: (1) The $500,000 payment by KFC; (2) the sale of FB's subsidiary, Baron Insurance Agency, for $2,000; and (3) the reduction of its liabilities by *40 approximately $502,000. Neither the September 30 nor December 31, 1970 balance sheet reflects (1) the final $425,000 contract payment due from KFC, subsequently amended to represent consideration for FB's covenant not to compete; (2) Pueblo's claim against FB for $450,000 and the return of its (Pueblo) stock; (3) the potential $760,000 class action suit against FB, based upon the Telemart transaction; (4) various other aforesaid lawsuits against FB; and (5) FB's guarantee of approximately $38,039 of its key employees' obligations. In the period subsequent to December 31, 1970 FB continued to incur expenses for utilities, telephone, secretaries, travel, entertainment, legal and professional services, and directors' fees in pursuit of its aforesaid activities. Until its taxable year beginning October 1, 1972 FB recognized a net operating loss for each year of its existence. For its taxable year ended September 30, 1973 through September 30, 1975, FB recognized net taxable income (before net operating loss deductions and special deductions) as follows: Taxable Year Ended
Net Taxable Income
September 30, 1973
$79,298.72
September 30, 1974
76,694.85
September 30, 1975
83,927.96
This realization *41 of net income was attributable to FB's accounting under its agreement not to compete with KFC, and FB's corresponding offset of $85,000 per year due under the loan made by Heublein to FB.
In 1970 FB in need of operating funds was unsuccessful in various attempts to raise additional capital in the public and private sectors. Petitioner, as vice president of FB and active in its operations, was aware, as of December 31, 1970, of the aforesaid facts and conditions relating to FB's operations, management and legal entaglements. Petitioner determined that his FB shares became worthless during the calendar year 1970 and claimed a deduction in the amount of $200,000 on his 1970 income tax return pursuant to section 165(a) and (g). OPINION In determining the year in which a worthless stock loss can be sustained under section 165(g) (1), all the pertinent facts and circumstances are open to consideration and inspection. A practical approach, not a "legal test," requires consideration of these relevant facts regardless of their objective or subjective nature. Boehm v. Commissioner,326 U.S. 287 (1945); Lucas v. American Code Co.,280 U.S. 445 (1930). Petitioner has the burden to establish *42 that he sustained a deductible worthless stock loss for the year in issue. Boehm,supra, citing Burnet v. Houston,283 U.S. 223 (1931). In Sterling Morton,38 B.T.A. 1270, 1278-9 (1938), affd. 112 F.2d 320 (7th Cir. 1940), the Board clearly set forth the standards and guidelines for a determination of worthlessness as follows: * * * [a] loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be forclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential *43 value of stock. The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and cannot be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. Applying these standards to the facts herein, it is incumbent upon petitioner to prove both loss of liquidating and potential value as of December 31, 1970. In meeting this criterion, a relevant "identifiable event" in FB's life also must be shown. [21] *44 In attempting to meet his burden, petitioner argues that as of December 31, 1970 the actual value of FB's liabilities exceeded the real value of its assets, that FB had no active business and that the size, nature and likelihood of the success of the claims against FB, along with its inability to collect the unpaid purchase price under the KFC agreement, precluded its shareholders from any reasonable hope of recovery of anything from FB stock. Petitioner cites the bankruptcy of Telemart as the identifiable event to confirm the time of such loss. It is our opinion that petitioner has not established the worthlessness of FB stock in 1970. The fact that conditions existing in 1970 may have been such as to lead petitioner and others to the conclusion that, without a change for the better, FB would become worthless, i.e., that FB's worthlessness was most probably imminent, is not sufficient to establish actual worthlessness. In determining net liquidating value of FB at the end of 1970, an item-by-item review of the actual value of the assets and liabilities is appropriate. Charles W. Steadman,50 T.C. 369 (1968) *45 affd. 424 F.2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970). We have found that FB's balance sheet per its books and records of December 31, 1970 showed an excess of assets over liabilities in the amount of $452,746.90. Petitioner must establish that the respective fair market values of the balance sheet items, as of December 31, 1970, differ from the book value, otherwise book value will constitute the best evidence. Ansley v. Commissioner,217 F.2d 252 (3rd Cir. 1954). Petitioner offered the testimony of FB's secretary-treasurer, Wendell Skinner, to prove that the balance sheet figures were not an accurate reflection of true value. Skinner, a nonpracticing C.P.A. in 1970, prepared the corporate income tax returns for the fiscal years ended September 30, 1970 through 1975. It was Skinner's testimony that the $66,652.72 of trade receivables due from KFC had little, if any, value because of the dispute between KFC and FB that we have found herein. However, the record indicates that FB's threats of legal action against KFC had proven successful in other related payment matters and no evidence has been introduced to show why collection action was not taken with regard to *46 the receivables in 1970. Furthermore, the corporate return prepared by Skinner for the year ended September 30, 1971 shows net trade receivables of $51,857.05. Although a write-off of these receivables in 1970 and 1971 would have no effect on taxable income because of FB's net operating losses, the fact that Skinner did not write off the receivables in 1970 or 1971 is inconsistent with Skinner's trial testimony. In fact, Skinner testified that after FB's counsel "got on KFC's back," FB received a settlement of these receivables in October 1972. We therefore conclude that such trade receivables due from KFC had substantial value. Similarly, the testimony of Skinner is inconclusive to establish the worthlessness or minimal value of the $18,807.57 of employee receivables. The record does not indicate any attempt by FB to collect such monies owed. A creditor is not required to resort to litigation to establish that a receivable is worthless, but we believe it is incumbent upon petitioner to show why reasonable efforts to collect such monies proved futile. Skinner's testimony that said prior employees were scattered throughout the country and his belief that such loans were uncollectable *47 does not give us sufficient basis to write off these receivables. See Royal Packing Co. v. Lucas,38 F.2d 180 (9th Cir. 1930). Also, we note that FB's tax return for the period ended September 30, 1971 showed these receivables in the amount of $18,723.12.
In reviewing the "other current asset" account on the FB's books on December 31, 1970, no account is taken of its rights under the June 23, 1970 FB-KFC letter agreement for payment on October 1, 1971, of $425,000. Under the March 19, 1971 letter amendment this $425,000 payment was restated to be consideration for FB's covenant not to compete, payment thereof equally spread over a five year period. The testimony of Louis Hutchinson, president of FB, and the stipulation of facts clearly indicate a substantial dispute between KFC and FB. We have found that as of December 1970, there existed serious doubts in the mindsof FB management that FB would ever be paid the $850,000, the balance of this contract price. We believe that our reasons in valuing the KFC trade receivables also apply in the instant situation. The $500,000 paid by KFC to FB in November 1970 was made only after FB's threat to sue. The subsequent $425,000 under the *48 September 23, 1970 letter agreement was not due until April 1, 1971. The final $425,000 was due October 1, 1971.Although under the circumstances it appeared probable to FB's management that these subsequent 1971 payments would not be made, we cannot say that the contract rights to such payments in December 1970 were of insignificant value. As of December 1970 FB had made no efforts to collect these amounts because they were not due for some three months. Petitioner cites Boehm v. Commissioner,supra, for the proposition that where asserted claims for money are the subject of dispute and the evidence indicates little likelihood of recovery, such claims need not be taken into account as an asset in determining the worth of the claimant company's stock. In Boehm the taxpayer, in an attempt to establish that all value had not departed from her stock prior to the year in issue, argued that the corporate derivative stockholders' suit, instituted against her corporation, was an asset of such corporation.The United States Supreme Court sustained our finding that no substantial value to the suit had been shown.However, FB did not have a lawsuit as an asset on its books, but the KFC contract *49 right for payment of specified amounts on specified dates, subject to substantial dispute. In our opinion the record fails to persuasively negate such contract right. Additionally, whether the October 1, 1971, $425,000 payment is classified as part of the purchase price or as consideration for FB's covenant not to compete, the value of such contract right must be included among FB's assets. In analyzing the "other investment" account on the books of FB on December 31, 1970, we are not persuaded by Skinner's testimony that the book value of Bill Bailey Communications should be written down to a couple of thousand dollars, which in his opinion was probably unrealizable. FB accounted for Bill Bailey Communications under the pooling of interest accounting concept, i.e., Bailey Communications' net asset position on its books. Skinner did not prepare the books and records and did not have responsibility for such records. His personal knowledge of Bailey Communications' equity position was inadequate to establish the component parts of Bailey Communications' $101,919 equity position and, in turn, their value in December of 1970. Furthermore, FB's income tax return shows that it did *50 not write off Bill Bailey Communications until its taxable year ended September 30, 1972. We note again that this return was also prepared by Skinner. In our full consideration of the facts and circumstances of this case, there is little doubt that the floor was about to fall in on FB. The financial life or death of FB and its key employees depended upon the outcome of the Pueblo litigation. Our findings indicate that FB's potential liability was in excess of $1,200,000 plus the possible loss of its Pueblo stock rights carried on its books at $687,700. In valuing FB's Pueblo stock interests we believe the proper approach to be the valuation of FB's rights under the May 22, 1970 agreement with consideration to the acknowledged litigation. At the end of 1970, it appeared highly probable to FB and its legal counsel that it would lose the Pueblo lawsuit. Such litigation certainly would have a chilling effect on the value of FB's Pueblo stock rights. However, we think there is no justification for considering such rights valueless during the pending litigation. In establishing the worthlessness of stock, pending litigation with the possibility of insolvency in the event of judgment *51 and litigation to recover assets, will not usually be taken into account until the year in which such litigation is lost. 5 Mertens, The Law of Federal Income Taxation, sec. 28.67, p. 307-308 (1975); Long v. Glenn,32 AFTR 1690 (DCWD Ky, 1943), affd. 145 F.2d 234 (6th Cir. 1944), Daniel J. Ryan,19 B.T.A. 52, 58 (1930). Moreover, in connection with the Pueblo events petitioner cites United States v. S.S. White Dental Mgf. Co.,274 U.S. 398, 402 (1927) as defining an identifiable event to be "the transaction causing the loss." Petitioner argues that the bankruptcy of Telemart in 1970 was the transaction evidencing the time of the loss to FB and its shareholders. We do not agree with petitioner. In September 1970 when Telemart was placed in bankruptcy, FB had contract rights for Pueblo stock of $687,700. The bankruptcy of Telemart foreclosed any possibility of Pueblo's delivery of additional shares based upon Telemart's net after tax 1971 earnings. Telemart's bankruptcy was a catalyst for the Pueblo-FB suit; it was an event which indicated the imminence of a loss but not the present fact of such loss. Burdan v. Commissioner,106 F. 2d 207 (3rd Cir. 1939). We measure an identifiable *52 event as a corporate event in its life such as the sale of its assets, its cessation from doing business, its bankruptcy, its liquidation, foreclosure on its property, etc. See Sterling Morton,supra.The bankruptcy of Telemart was not such a proximate event within FB's corporate life. Furthermore, the filing of the Pueblo lawsuit cannot be considered an identifiable event. Prospective losses based upon future contingencies are purely speculative. Anthony P. Miller, Inc.,7 T.C. 729, 746 (1946) affd. 164 F. 2d 268 (3rd Cir. 1947); Daniel J. Ryan,supra.We believe it behooving on petitioner to point to an identifiable event within the corporation's life which clearly signals loss of potential value. In our opinion, petitioner has failed to do this. A later recovery is not a bar to a worthless stock deduction in a year subsequent to the occurrence of the identifiable event. United States v. S. S. White Dental Mfg. Co.,supra. The identifiable event in S. S. White Dental Mfg. Co. was the sequestration during World War I by the German government of taxpayer's German based corporate assets. The Supreme Court sustained the worthless stock deduction in the year of sequestration *53 although after the War, the German government bound itself to repay and an award was made. Therefore, petitioner argues that although FB finally settled its Pueblo related litigation in 1971 and received payment from KFC, the facts underscore the conclusion of worthlessness in 1970 as evidenced by FB's insolvency reflected on its balance sheet for its fiscal year ended September 30, 1972 and 1973. An examination of the balance sheets discloses the entry of the Heublein loan in the "mortgages, notes, bonds payable in one year or more" account in the declining amount of $255,000 and $170,000 for fiscal years ended in 1972 and 1973, respectively. Under the terms of the five year $425,000 loan to FB, payments coming due under FB's March 19, 1971 agreement with KFC could be offset without notice to FB against installments coming due under such loan from Heublein.FB's balance sheet does not account for the receivable under the KFC contract. Considering this receivable, FB's assets would exceed its liabilities by approximately $163,000 and $157,000 for its fiscal years ended September 30, 1972 and 1973. Significantly, we note that after the smoke cleared FB's net equity position on its *54 September 30, 1975 balance sheet is $147,565.33. Petitioner also argues that the implied refusal of Southern California First National Bank to accept his FB stock as collateral for his personal loans is indicative of FB's stock worthlessness. However, "there are many considerations, other than worthlessness, which might prompt conservative business minds to refuse a given stock as collateral." Anthony P. Miller, Inc.,supra at 746; Royal Packing v. Lucas, supra. Certainly a bank does not always mean to equate its refusal to take a stock as collateral with a judgment that such stock is worthless. The facts and circumstances of 1970 placed FB and its key employees in a very unfavorable situation. It is well settled that such factors as lack of working funds, deficits, operating losses, poor business conditions, and similar circumstances are insufficient in themselves to establish worthlessness of stock. Anthony P. Miller,supra at 747, and the cases cited therein; Walter H. Goodrich & Co.,40 B.T.A. 960 (1939). We will not require petitioner to be an "incorrigible optimist." S. S. White Dental Mfg. Co.,supra.On the record before us, it is obvious that in 1970 FB stock sustained a *55 severe shrinkage in value. Nevertheless pessimism, however reasonable, does not require, without more, a determination that the stock under consideration was worthless at the time suggested. However, the record is inconclusive to justify worthlessness. Petitioner has failed to sustain his burden of proving the necessary elements to establish worthlessness. In view of the foregoing, Decision will be entered for respondent. Footnotes
1. Subsequent to its incorporation, but prior to December 31, 1970, FB recapitalized and petitioner received 125,000 shares of common stock reflecting capital of $1.60 per share in exchange for his 200,000 shares of FB stock. 2. FB's books and records were kept in accordance with established tax guidelines and the information on its tax returns reflects these underlying books and records. ↩
3. Due from Kentucky Fried Chicken Corporation. ↩
4. For 1970 this represented the receivable due under the Kentuckly Fried Chicken-FB agreement of June 23, 1970. ↩
5. As of 9-30-70 FB had investments in subsidiaries totalling $103,919.24, consisting of $101,919,24 for Bill Bailey Communications and $2,000 for Baron Insurance Agency. The Bailey investment was accounted for under the pooling of interest accounting procedure. The remaining $687,700 represented Pueblo, International, stock.↩
6. Kentucky Baron of California, Inc. and Kentucky Baron of Florida, Inc. were corporations organized to operate fastfood service fish and chips outlets. All of these outlets lost money from their inception.
7. Petitioner was vice president of operations of FB and Kentucky Baron.↩
8. This remaining $425,000 was paid prior to September 30, 1971. ↩
9. Louis C. Hutchinson, petitioner, and individuals identified as Reese, Camp and Skinner.↩
10. This offset occurred in each year.↩
11. The record is unclear as to the exact date.↩
12. Under the formula, the number of shares which were to be free of the cancellation provision was equal to 2.5 times the 1971 earnings of Telemart. The number of shares to be cancelled (which was subject to a limitation of not more than 375,000 shares) was equal to 750,000 shares minus the number of shares free of the cancellation provision, computed as described in the preceding sentence. The agreement provided that all of the 395,000 Telemart shares owned by FB were to be subject to the cancellation provision.↩
13. The record indicates that FB sold its Telemart stock because Telemart needed substantial funds, which FB could not supply. Pueblo International, Inc. loaned Telemart approximately $300,000 in consideration of FB giving up its controlling interest in Telemart. ↩
14. To the extent that Telemart met the net after-tax earnings requirements for the fiscal year ended December 31, 1971 described above, and the soft shares were not cancelled, Pueblo agreed to deliver additional Pueblo shares in an amount equal to $1.83 for each soft share not cancelled, or a maximum of $512,400 of additional Pueblo stock.
15. Telemart's bankruptcy in 1970 precluded any possibility that Pueblo would be obligated to deliver to FB additional shares as required by the purchase agreement in the event that Telemart's earnings exceeded $300,000 for 1971.
16. See Royal Air Properties, Inc. v. Smith,312 F.2d 210 (9th Cir. 1962). However, respondent on stipulation of facts does not admit that such legal counsel's opinion is correct. Additionally, we note that Pueblo's complaint set forth six other claims against FB: violation of sec. 12(2) and 17(a) of the Securities Exchange Act of 1933; violation of sec. 25401 of the California Corporate Securities Act of 1968; rescission for fraud and failure of consideration; breach of contract; and fraud or negligent misrepresentation.
17. FB's counsel estimated costs of defense at this time to be in excess of $50,000, an estimate eventually borne out.↩
18. Edith L. Anderson, et al v. Food Baron Corporation, et al,↩U.S. District Court, Southern District of California, Docket No. 71-220-S.
19. On December 31, 1970 the fair market value of 34,385 shares of Pueblo stock on the New York Stock Exchange was $442,706.87. The stock held by FB was not registered and probably would not be registered in light of the pending lawsuit.↩
20. Proceeds of the sale amounted to $527,602.98 and generated a long-term capital gain of $383,758.36.↩
21. Respondent concedes on brief that FB stock had value at the outset of 1970 and therefore petitioner only need establish worthlessness during 1970.