T.C. Memo. 1996-270


UNITED STATES TAX COURT


RICHARD A. AND CAROL B. LITTLE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 27374-93.                    Filed June 12, 1996.


     P owned stock in Dondi Financial (DF).  DF held 97
percent of the stock of Vernon (V).  V was a savings
and loan.  The FHLBB seized V, terminated its
operations, and appointed the FSLIC as its receiver in
March 1987.  DF filed for bankruptcy in May 1987.

     P owned stock in Texana (T).  T held 98 percent
of the stock of Texana Savings & Loan (TSL).  The FHLBB
put TSL in receivership and appointed the FSLIC to
liquidate TSL in August 1988.  P deducted losses for
worthless stock from DF in 1987 and T in 1988.  R
disallowed part of the DF loss and all of the T loss.
R amended the answer, contending that P owed an
additional deficiency because the DF stock became
worthless in 1985.

     R called two FBI agents as witnesses and offered
into evidence 264 pages of interview notes.  In
response to P's hearsay objection, R argued that the
agents' oral testimony and notes were records or

reports of a public agency admissible under Fed. R. Evid. 803(8) or (24).

Held: R's contention in the amended answer is new matter upon which R bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.

Held, further, oral testimony of the two FBI agents is not a record or report of a public agency of Fed. R. Evid. 803(8).

Held, further, oral testimony of the two FBI agents is not admissible under Fed. R. Evid. 803(24) because respondent did not satisfy the notice requirement of the rule.

Held, further, the interview notes are not admissible because they were not exchanged before trial contrary to the Court's standing pretrial order.

Held, further, P may deduct $727,600 for DF stock in 1987.

Held, further, P may deduct $199,600 for T stock in 1988.

John D. Copeland, for petitioners.

Steven Walker and Barbara Leonard, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge: Respondent determined that petitioners had deficiencies in Federal income tax of $162,761 for 1987 and $57,199 for 1988. Respondent filed an amended answer asserting an additional deficiency of $31,170 for 1987.

The issues for decision are:

1. Whether respondent's contention that petitioners' worthless stock deduction for Dondi Financial Corp. (Dondi

Financial) stock in 1987 was taken in the wrong year is new matter on which respondent bears the burden of proof. We hold that it is.

2. Whether testimony in the trial of this case by Federal Bureau of Investigation (FBI) special agents is a record or report of a public agency, admissible under rule 803(8) or (24) of the Federal Rules of Evidence. We hold that it is not.

3. Whether 264 pages of interview notes made by FBI special agents which were not exchanged before trial are admissible. We hold that they are not.

4. Whether petitioners may deduct $727,600 for a loss from Dondi Financial stock in 1987. We hold that they may.

5. Whether petitioners may deduct $199,600 for a loss from Texana Capital Corp. stock in 1988. We hold that they may.

Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise stated.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners

Petitioners are married and lived in Scottsdale, Arizona, when they filed their petition.

Richard A. Little (petitioner) graduated from the University of Michigan in 1957 with a bachelor's degree in economics. Petitioner was an officer in the U.S. Air Force. He was

stationed in France from 1959 to 1961.  He returned to the United States in 1961 and worked for 6 months as a registered stockbroker in Santa Barbara, California.  He then worked for a home builder in Ventura, California, for about a year and a half. From 1961 to 1970, he operated his own building company and joint ventured with another person for 3 years.

After succeeding in the home building business in California, petitioner moved to New York City to work for Levitt & Sons, one of the nation's largest single-family-home builders. After about 3 years, he took a position in Columbus, Ohio, with a company that built apartment buildings.  Petitioner then worked in Jacksonville, Florida, for a company that built apartment and condominium buildings.

In 1970, petitioner moved to the San Francisco area to work for Builders Resources (Builders).  Builders' primary business was providing venture capital to small builders throughout the United States.  Petitioner worked for Builders for about 2 years. During that time he met Donald R. Dixon (Dixon).  Dixon was then the third largest single-family-home builder in Dallas, Texas. Builders financed Dixon's Dallas home-building activities.

From 1970 to 1978, petitioner worked on several real estate developments and syndications and became the chief financial officer of a residential real estate firm.  In 1978, petitioner moved to France.  In 1980, he moved to London and helped to

establish the U.S. Property Trust, which invested money from English and Scottish pension funds.

Petitioner was financially successful. In 1974, he bought 50 acres of land in Sonoma County, California. He started a vineyard which produced about $50,000 per year net of expenses and taxes starting in 1979. Petitioner sold the vineyard in 1988.

B. Dondi Financial Corp.

1. Petitioner's Association With Dondi Group, Inc., From January to September 1981

Dixon contacted petitioner in 1980. Dixon wanted petitioner to work for him. At Dixon's request, petitioner went to Dallas in January 1981 to see Dixon's home building business. Petitioner decided to work for Dixon. Petitioner joined Dixon's organization, Dondi Group, Inc., and ran a subsidiary financing company called Dondi Equities. Petitioner commuted between London and Dallas from February to May and moved to Dallas in June 1981. While working at Dondi Equities, petitioner met Woody Lemons (Lemons). Lemons was president of Vernon Savings & Loan (Vernon) at the time.

Petitioner stopped working for Dondi Equities in September 1981. He moved to Houston, Texas, and started building single-family homes and an apartment project with a friend.

2. Dixon's Purchase of Vernon

During the summer of 1981, Dixon decided that he wanted to buy a savings and loan. Dixon researched various financial institutions and chose Vernon. Dixon proposed that he buy 70 percent of Vernon's stock, and that petitioner, Lemons, and Rick Ramsey (not otherwise identified in the record) each buy 10 percent.

Dixon bought 97 percent of Vernon in January 1982 for an amount not stated in the record. Dixon paid 20 percent of the purchase price in cash and financed 80 percent.

Dixon transferred Vernon's stock to Dondi Financial in June 1982. Dondi Financial was a holding company formed to hold Vernon stock. Dondi Financial had no other assets. Dondi Financial assumed Dixon's obligation to pay the rest of the purchase price. Dondi Financial paid significant amounts on this obligation while it owned Vernon.

### 3. Petitioner's Reassociation With Dondi Group, Inc.

Dixon contacted petitioner in June 1983. Petitioner needed additional capital for his apartment project. Dixon convinced petitioner to work for him again by agreeing to provide capital for the project. Petitioner moved to Dallas and started working for Dixon at Dondi Financial in June 1983.

Petitioner became president of Dondi Financial shortly after he returned. Lemons was Vernon's chairman when petitioner returned to Dondi Financial.

### C. Texana Savings & Loan

1.    Lemons' Purchase of Tomanet Stock

In mid-1983, Lemons approached petitioner about buying another savings and loan.  Lemons suggested that he, petitioner, and several other Dondi Financial and Vernon executives buy the stock of a holding company named Tomanet.  Tomanet owned about 98 percent of the stock of Texana Savings & Loan (Texana).

Lemons negotiated an option to buy Tomanet stock.  Lemons bought Tomanet stock with purchase money mortgages from Tomanet stockholders and financial institutions such as First City Savings.  Petitioner and the other investors were to give Lemons a downpayment and execute a note payable to him for the balance of the purchase price if they wanted to buy the Tomanet stock.

2.    Petitioner's Purchase of Tomanet Stock From Lemons

Petitioner bought 34,900 shares of Tomanet stock for $199,600 on December 12, 1983.  Petitioner paid $77,200 as a downpayment.  Petitioner borrowed the downpayment from State Savings & Loan (not further identified in the record) through an unsecured loan.  Petitioner executed notes, payable to Lemons, for $106,795 and $15,605 on December 12, 1983.

Lemons gave petitioner quarterly reminders of the amounts due under the notes.  Petitioner paid Lemons about $31,795 on the $106,795 note.  Petitioner had no agreement with Lemons to not make payments on the $106,795 note.  Petitioner paid about $4,100 on the $15,605 note.

On December 13, 1983, Tomanet issued stock certificates to petitioner for 14,535 shares and 20,365 shares. Petitioner pledged 20,365 shares to Lemons as security for his note.

On August 2, 1984, Tomanet changed its name to Texana Capital Corp. (Texana Capital). Petitioner was not involved in any of Texana's activities and did not receive Texana's financial statements.

D.   Petitioner's Transfer to Vernon's California Subsidiary and Dixon's Offer To Sell Dondi Financial Stock to Dondi Group, Inc., Employees

Petitioner left Dallas in August 1984 to become president of Vernon Asset Management Corp., a Vernon subsidiary in southern California. While in California, petitioner did not control Vernon's day-to-day operations or know about every loan Vernon made.

On August 16, 1984, Vernon entered into a supervisory agreement (not otherwise described in the record) with the Federal Savings and Loan Insurance Corporation (FSLIC).

Dixon offered to sell Dondi Financial stock to Dondi Group, Inc. employees in December 1984. Dixon required any employee who wanted to buy the stock to pay 15 percent down and execute a purchase money mortgage for 85 percent. The purchase money mortgage was a 5-year note. Employees were to pay only interest during the 5 years and make a balloon payment of the principal after 5 years. Dixon held at least 51 percent of Dondi Financial stock at all relevant times.

Petitioner bought 6,800 shares of Dondi Financial stock on January 1, 1985. Petitioner paid $727,600 for the stock. Petitioner paid $109,140 in cash and executed a note for $618,460. The cash consisted of $6,975 from deferred compensation, $3,083 from interest on the deferred compensation, $30,600 from accrued dividends, and $68,482 from a loan from Vernon. The loan from Vernon was evidenced by a 5-year note for $68,482 and secured by petitioner's savings account. Petitioner paid the $68,482 note in 1986.

The $618,460 note was payable to Dondi Financial. The note required petitioner to make quarterly payments and had an interest rate of 11.25 percent. The note was fully recourse. Petitioner pledged his Dondi Financial stock as security for the note. From February 28, 1985, to July 14, 1986, petitioner paid $107,160.92 on the note.

Petitioner agreed to give Dixon, Dondi Financial, and the other Dondi Financial shareholders an option to buy petitioner's Dondi Financial stock if he stopped working for Dondi Financial. Dixon had the first right to buy the shares. If Dixon did not buy the stock within 30 days, Dondi Financial could exercise its option. If Dondi Financial did not do so, the shareholders could buy the stock pro rata. If neither Dixon, Dondi Financial, nor the other shareholders exercised their option, Dondi Financial had to buy the stock.

E.    Initial Actions by Bank Regulators

1.    The Cease and Desist Order

On June 16, 1986, the Federal Home Loan Bank Board (FHLBB) issued a cease and desist order (FHLBB order) to Vernon because of its improper lending practices.  The FHLBB order required Vernon to correct its loan approval process, to evaluate its portfolio, and to bring its operations into compliance with regulatory standards.  The FHLBB order required Vernon to prepare a plan detailing its projected business strategies and operations through June 30, 1989.

2.    Petitioner's Resignation From Dondi Financial

Petitioner resigned from Dondi Financial on August 15, 1986.  Petitioner wanted to sell his Dondi Financial stock for about $1.3 million as provided by the shareholder agreement.  In December 1986, Dondi Financial offered to buy petitioner's stock for an amount not disclosed in the record.  Petitioner rejected this offer.  Petitioner and Dondi Financial could not agree on a selling price, and petitioner did not sell the stock.

3.    Vernon's Financial Troubles

In September 1986, the State of Texas appointed Earl Hall (Hall), a State regulatory agent, to run Vernon.  Hall and the remaining directors tried to continue Vernon's operations.

On December 11, 1986, respondent issued a refund check to Dondi Financial for $6,054,581.  On January 15, 1987, Dondi Financial endorsed the check to Vernon.

F.    The Attempted Sale of Texana Capital

In late 1986, petitioner and other Texana Capital shareholders tried to sell Texana Capital's Texana stock.  The shareholders held about 93 percent of Texana Capital's shares and Texana Capital held about 98 percent of Texana's shares.  Texana Capital had no assets other than Texana stock.

In November or December of 1986, Lemons negotiated the sale of Texana Capital's Texana stock.  In February of 1987, Lemons and petitioner signed agreements to sell the stock.  However, the parties did not make a final agreement, and petitioner never sold his stock.  Petitioner would have made a profit of about $44,000 if the agreement had been completed.

G.    Termination of Vernon's Operations and Bankruptcy of Dondi Financial

1.    The Seizure of Vernon

The FHLBB seized Vernon, terminated its operations, and appointed the FSLIC as receiver on March 20, 1987.  Vernon disavowed all of its obligations to pay its creditors.  Vernon was reconstituted as Vernon Federal Savings Association (VFSA).  VFSA did not issue stock to Dondi Financial to replace Dondi Financial's holdings in Vernon.

On April 27, 1987, the FSLIC sued seven Vernon officers, including petitioner, for $350 million.

2.    The Bankruptcy of Dondi Financial

Dondi Financial filed for bankruptcy on May 9, 1987.
Petitioner filed a claim against Dondi Financial for $577,626.
This amount was the difference between the repurchase price of
his stock and the balance on the note.  The bankruptcy trustee
(trustee) sued petitioner for $659,118 plus interest on
petitioner's note.  These suits were settled on June 22, 1990.
Petitioner paid the bankruptcy estate $2,500 and withdrew his
suit.  The trustee also withdrew his suit.

Philip Palmer (Palmer) was the attorney for Dondi
Financial's bankruptcy trustee.  Palmer examined Dondi
Financial's books and records during his investigation of Dondi
Financial.  Palmer saw Vernon's financial statements, including
those which had been certified by audit and others that had been
prepared by Government regulatory authorities for each year
before the bankruptcy, monthly reports from 1984 to 1986, and
regulatory reports.  Palmer used these documents to estimate
Vernon's fair market value from about 1982 to 1986.  Palmer took
into account the fair market value of Vernon and about three of
its small subsidiaries in estimating when Dondi Financial became
insolvent.  Palmer focused on Vernon's commercial and residential
loans because Vernon's and Dondi Financial's insolvency resulted
from the improper granting and reporting of these loans.

3. The FSLIC's Seizure of Petitioner's Assets

On June 29, 1987, the FSLIC obtained a preliminary injunction against seven Vernon directors, including petitioner. The injunction sequestered the directors' assets. The injunction allowed petitioner to spend $2,000 each month. That amount was increased a few days later to $3,500. Because of the injunction, petitioner could no longer make payments on the $106,795 note to Lemons. The injunction made petitioner insolvent. The injunction was still in effect at the time of the trial of this case.

4. The Closing of Texana

On August 19, 1988, the FHLBB put Texana in receivership and appointed the FSLIC as receiver to liquidate Texana.

H. Criminal Prosecution and Conviction of Some Vernon Officers and Directors

Some Vernon officers and directors (not including petitioner) were convicted of crimes relating to their activities at Vernon or its subsidiaries. On September 8, 1988, Roy Dickey, a former Vernon president, was convicted of falsifying a delinquent loan list submitted to the FSLIC. On August 29, 1989, James R. Veteto, the former president of Vernon Service Corp., was convicted of falsifying Vernon loans. On October 5, 1989, Pat L. Malone, a Vernon executive vice president, was convicted of misapplying Vernon funds, using false documents to conceal the misapplication of funds, and using the misapplied funds to make

illegal political campaign contributions. On November 8, 1989, Patrick King, a former vice chairman of Vernon's board of directors, was convicted of making false entries in Vernon books, reports, and statements, and of using Vernon funds to make illegal campaign contributions. On April 10, 1990, Lemons was convicted of misapplying Vernon funds and accepting a bribe. Petitioner was not indicted for or convicted of any crimes relating to Vernon.

## OPINION

### A. Burden of Proof

We first decide whether respondent's contention that petitioners' worthless stock deduction for Dondi Financial stock in 1987 was taken in the wrong year is new matter on which respondent bears the burden of proof.

#### 1. Burden of Proof If Respondent Raises New Matter or An Increased Deficiency in An Amended Answer

The taxpayer generally bears the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, if the Commissioner pleads new matter or an increased deficiency in the answer, the Commissioner has the burden of proof as to the new matter or increased deficiency. Rule 142(a). A new position taken by the Commissioner is not new matter if it clarifies and is consistent with the original determination and does not increase the deficiency. Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner, 50 T.C. 478,

492-493 (1968). However, if the new position requires the taxpayer to present different evidence, it is new matter, and the Commissioner bears the burden of proof. <u>Achiro v. Commissioner</u>, 77 T.C. 881, 890 (1981); <u>Estate of Falese v. Commissioner</u>, 58 T.C. 895, 899-900 (1972).

2. <u>Notice of Deficiency</u>

Petitioners deducted $727,600 for worthless Dondi Financial stock in 1987 and $199,600 for worthless Texana Capital stock in 1988. In the notice of deficiency, respondent disallowed $618,460 of petitioners' deduction for 1987 and all of their deduction for 1988. Respondent determined that petitioners "did not establish that the amount shown, i.e. $618,460 and $199,600 was (a) a loss, and (b) sustained by you". The notice of deficiency also included the following calculation:

| <u>1987</u> | | <u>1988</u> | |
|---|---|---|---|
| Purchase cost | $727,600 | Purchase cost | $199,600 |
| Less cash paid | 109,140 | Payments verified | 0 |
| Adjustment | 618,460 | Adjustment | 199,600 |

3. <u>Amendment to Answer</u>

In the petition, petitioners contended that respondent erred in disallowing the worthless stock deductions. In the answer, respondent denied that respondent's determination was in error. About 11 months later and 14 days before trial, respondent moved to amend the answer and lodged an amended answer. We granted respondent's motion.

In the amended answer, respondent asserted that petitioners were liable for an increased deficiency of $31,170 for 1987 because they were not entitled to deduct the $109,140 respondent had previously allowed for the Dondi Financial stock. In the amended answer, respondent asserted for the first time that, because Dondi Financial "became insolvent in a year earlier than 1987, * * * the stock in Dondi Financial Corp. became worthless no later than August 1, 1985".

4. Increased Deficiency and New Matter Under Rule 142

Respondent contends that the amended answer did not raise new matter for purposes of Rule 142 and that the notice of deficiency required petitioners to prove that the Dondi Financial stock became worthless in 1987. Respondent argues that respondent discovered that the notice of deficiency mistakenly failed to disallow all of the deduction, and that respondent's error was computational. Respondent also contends that the notice of deficiency was broadly worded and that the amended answer is consistent with that broad language.

Respondent bears the burden of proof if respondent asserts an increased deficiency. Rule 142(a). Thus, respondent bears the burden of proving that petitioner is liable for the additional deficiency of $31,170.

We also conclude that respondent raised new matter in the amended answer. Respondent allowed petitioners' deduction in 1987 for part of the Dondi Financial stock loss ($109,140).

Petitioner would not be entitled to any worthless stock deductions for Dondi Financial in 1987 unless it became worthless in 1987. We can only conclude that respondent was not challenging petitioners' claim that the Dondi Financial stock became worthless in 1987. In the amended answer, respondent contends that the Dondi Financial stock became worthless no later than August 1, 1985. Petitioners would be required to present different evidence to contest this allegation than they would have been required to present to contest the notice of deficiency. Thus, respondent's contention in the answer is new matter upon which respondent bears the burden of proof.

Respondent contends that the amended answer corrected a mathematical computation in the notice of deficiency. We disagree. Respondent has not identified a mathematical error in the notice of deficiency.

Respondent contends that petitioners bear the burden of proof because they are not prejudiced if they are required to prove the year their Dondi Financial stock became worthless. Respondent contends that petitioners are not prejudiced because they amended their petition after respondent amended the answer to claim that, if their Dondi Financial stock did not become worthless in 1987, then it became worthless in 1985 or 1986. We disagree. First, Rule 142(a) provides that the burden of proof on new matter is on the Commissioner; Rule 142(a) does not limit this to cases where the taxpayer would be prejudiced by

bearing the burden of proof. Rule 142(a). Second, petitioners would be prejudiced by being first told 14 days before trial that they have the burden of proving when their Dondi Financial stock became worthless.

### 5. Conclusion

Petitioners bear the burden of proving that their basis in Dondi Financial stock was as claimed on their 1987 tax return. Respondent bears the burden of proving that the Dondi Financial stock became worthless before 1987.

## B. Evidentiary Matters

We next decide whether certain evidence is admissible.

### 1. Testimony by FBI Special Agents

In the pretrial memorandum, respondent listed two FBI special agents as witnesses, Curt L. Hodges (Hodges) and Dale V. Hogue (Hogue). Respondent's memo said only that both agents would testify about their "investigation of the facts surrounding this case and to the truthfulness or untruthfulness of the petitioner's witnesses".

In 1987, Hodges and Hogue were assigned to a task force created to investigate suspected criminal activity in the Texas savings and loan industry. Hogue was the agent in charge of the Vernon investigation from 1987 to 1991. Hodges investigated Vernon from 1987 to 1992.

Respondent called Hodges and Hogue to testify about their investigation.  Petitioner objected that the testimony was hearsay.

2.    Whether Hodges' and Hogue's Testimony Is a Record of a Public Agency for Purposes of Rule 803(8) of the Federal Rules of Evidence, the Public Records Exception to the Hearsay Rule

The Federal Rules of Evidence generally apply to proceedings of this Court.  Sec. 7453; Rule 143(a); Conti v. Commissioner, 99 T.C. 370, 373 (1992), affd. 39 F.3d 658 (6th Cir. 1994); Estate of Shafer v. Commissioner, 80 T.C. 1145, 1151 (1983), affd. 749 F.2d 1216 (6th Cir. 1984).  Respondent concedes that Hodges' and Hogue's testimony is hearsay but contends that it is admissible under rule 803(8)(C) of the Federal Rules of Evidence, as a report or statement of a public agency.

Records, reports, statements, or data compilations of a public agency setting forth factual findings resulting from an investigation made pursuant to authority granted by law are admissible as an exception to the hearsay rule unless the sources of information or other circumstances indicate lack of trustworthiness.[1]  Fed. R. Evid. 803(8)(C).

---

[1] Fed. R. Evid. 803(8) provides an exception to the hearsay rule for:

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding,

(continued...)

Respondent contends that the trial testimony of Hodges and Hogue is a statement of a public agency for purposes of rule 803(8)(C) of the Federal Rules of Evidence.  We recognize that the word "statement", viewed in isolation, could refer to an oral communication.  If rule 803 of the Federal Rules of Evidence referred to statements by "an employee of" a public agency, we might agree with respondent that oral testimony could be a "statement" for purposes of that rule.  However, the phrase "an employee of" does not appear in rule 803(8) of the Federal Rules of Evidence.  Thus, we think the phrase a "statement * * * by a public agency" does not include an oral statement by an individual agency employee; instead, we think it refers to a more formal, written document which was reviewed, approved, or subject to a clearance process of some sort that transforms it from a statement by an employee of an agency to a statement "by" the agency.

Respondent does not cite and we have not found a case where trial testimony was admissible as a record or report of a public

---

(...continued)
however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

agency under rule 803(8) of the Federal Rules of Evidence.  The cases respondent cites all involve written documents.  See Yaich v. United States, 283 F.2d 613, 616 (9th Cir. 1960) (selective service file); Olender v. United States, 210 F.2d 795, 801-802 (9th Cir. 1954) (file containing affidavits, investigator reports, and bank reports); Wong Wing Foo v. McGrath, 196 F.2d 120, 123 (9th Cir. 1952) (transcript of an administrative hearing); Vanadium Corp. of Am. v. Fidelity & Deposit Co., 159 F.2d 105, 108-109 (2d Cir. 1947) (written interdepartmental communications).  Contrary to respondent's position, Professor Wigmore concludes that a statement should be in writing to be admitted under the common law public records exception.  Wigmore on Evidence, sec. 1633(5), at 623 (1974).

We conclude that Hodges' and Hogue's oral testimony is not admissible under rule 803(8)(C) of the Federal Rules of Evidence.

3.   Whether Hodges' and Hogue's Oral Testimony Is Admissible Under Rule 803(24) of the Federal Rules of Evidence, the Residual Exception to the Hearsay Rule

a.   Background

Respondent contends that Hodges' and Hogue's testimony is admissible under rule 803(24) of the Federal Rules of Evidence,[2]

---

[2] Fed. R. Evid. 803(24) provides an exception to the hearsay rule for:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is

(continued...)

the residual exception to the hearsay rule.  To admit a statement under rule 803(24) of the Federal Rules of Evidence, the proponent must show that it:  (1) Has circumstantial guarantees of trustworthiness equivalent to those required to qualify for other hearsay exceptions; (2) is offered as evidence of a material fact; (3) is more probative on the point for which it is offered than any other evidence which the proponent could obtain through reasonable efforts; (4) serves the general purposes of the Federal Rules of Evidence and the interests of justice if admitted; and (5) was provided with particulars of the testimony to the other party sufficiently in advance of trial so that the other party has a fair opportunity to prepare to meet it.  Fed. R. Evid. 803(24).  Rule 803(24) of the Federal Rules of Evidence is narrowly construed and applies only in exceptional circumstances.  SEC v. First City Fin. Corp., 890 F.2d 1215 (D.C. Cir. 1989); United States v. Kim, 595 F.2d 755 (D.C. Cir. 1979);

---

(...continued)
     offered as evidence of a material fact; (B) the
     statement is more probative on the point for which
     it is offered than any other evidence which the
     proponent can procure through reasonable efforts;
     and (C) the general purposes of these rules and the
     interests of justice will best be served by admission
     of the statement into evidence.  However, a statement
     may not be admitted under this exception unless the
     proponent of it makes known to the adverse party
     sufficiently in advance of the trial or hearing to
     provide the adverse party with a fair opportunity to
     prepare to meet it, the proponent's intention to offer
     the statement and the particulars of it, including the
     name and address of the declarant.

Powers v. Commissioner, 100 T.C. 457, 485 (1993); Goldsmith v. Commissioner, 86 T.C. 1134, 1140 (1986).

### b. Notice Requirement

Rule 803(24) of the Federal Rules of Evidence requires the offering party to notify the opposing party of the particulars of the testimony sufficiently in advance of trial to prepare to meet it.

Respondent contends that petitioner had adequate notice of Hodges' and Hogue's testimony. We disagree. Respondent's only notice to petitioner was a statement in the pretrial memorandum that the two agents would testify about the truthfulness or untruthfulness of petitioners' witnesses and the facts surrounding this case (i.e., this civil tax case), a case which Hodges said at trial was not the subject of the task force's investigation. Respondent did not give notice to petitioners of any of the particulars of the direct examination, which covered 106 transcript pages.

Respondent cites United States v. Brown, 770 F.2d 768, 771 (9th Cir. 1985), and Piva v. Xerox Corp., 654 F.2d 591, 596 (9th Cir. 1981), in which the U.S. Court of Appeals for the Ninth Circuit interpreted the notice requirement of rule 803(8)(C) of the Federal Rules of Evidence.

In Brown, the Court of Appeals held that the trial court properly admitted the defendants' passports where the Government did not tell the defendants before trial that it intended to

offer the passports into evidence. <u>United States v. Brown</u>, <u>supra</u>. The Government's failure to meet the notice requirement did not prevent admission of the passports because the defendants had a fair opportunity to attack the trustworthiness of their own passports. <u>Id.</u>

In <u>Piva</u>, work sheets and information about job applicants were held to be admissible even though the notice requirement was not met. The trial lasted more than a year after the evidence was admitted, during which the other party could have moved to strike it or could have rebutted it with additional evidence. Also, the opposing party had ample opportunity to attack the trustworthiness of the evidence through extensive cross-examination, and the trial court found that the evidence was reliable. <u>Piva v. Xerox Corp.</u>, <u>supra</u> at 595-596.

This case is very different from <u>Brown</u> and <u>Piva</u>. Respondent elicited very detailed testimony from Hodges and Hogue. Petitioner had no notice of the testimony except for a general reference in respondent's pretrial memorandum. Respondent contends that petitioner had a fair opportunity to cross-examine Hodges and Hogue. We disagree. Although petitioners' counsel had cross-examined Hodges and Hogue, respondent's pretrial memorandum did not help petitioners to prepare for it. Petitioners' counsel telephoned both Hodges and Hogue about a week before trial to ask about their testimony. However, neither agent responded to his inquiry. We hold that respondent did not

give petitioners notice as required by rule 803(24) of the Federal Rules of Evidence.

### c. Circumstantial Guarantees of Trustworthiness

Respondent must also show that Hodges' and Hogue's testimony has circumstantial guarantees of trustworthiness equivalent to those required to qualify for other hearsay exceptions. Fed. R. Evid. 803(24). Respondent contends that the testimony meets this requirement because the FBI agents had an adequate basis for their factual findings, the results of the FBI's investigation support the truthfulness of the FBI agents' factual findings, petitioner extensively cross-examined the FBI agents, and statements made by public officials based on their factual findings from an investigation made pursuant to authority granted by law are generally believed to be trustworthy. We disagree that these points establish circumstantial guarantees of trustworthiness equivalent to those required to qualify for other hearsay exceptions.

Respondent's only reference to another hearsay exception is to rule 803(8) of the Federal Rules of Evidence. We held above that rule 803(8) of the Federal Rules of Evidence does not apply here. See par. B-2, p. 18. The rules of evidence do not provide a blanket hearsay exception for testimony by public officials. Respondent has not shown that the FBI agents' testimony has circumstantial guarantees of trustworthiness that are equivalent to other hearsay exceptions.

We hold that the testimony of Hodges and Hogue is not admissible under rule 803(24) of the Federal Rules of Evidence.

4.   Whether Statements Made by Witnesses to FBI Agents Are Admissible

a.   FD-302 Reports

Hodges and Hogue testified that the FBI agents assigned to the task force prepared memoranda of interviews with 300 to 400 people during their investigation of Vernon.  These documents are FD-302 reports (302 reports).

Respondent offered into evidence 302 reports for 25 witnesses, covering 264 pages.  Respondent first gave the 302 reports to petitioner at 2 p.m. on the second (and last) day of trial.  Respondent also asked that the 302 reports be sealed. Respondent asked that the 302 reports be used only for the instant case and that the copy petitioner was to receive be returned by petitioners' counsel with a statement, under penalty of perjury, that it had not been copied or released and that no additional copies of which he was aware were made.

Petitioner objected to admitting the 302 reports on the grounds that they were not exchanged before trial as required by the standing pretrial order and that they are hearsay.

b.   Standing Pretrial Order

About 5 months before this case was calendared for trial, we sent a copy of the Court's standing pretrial order to the

parties.  It stated in part:  "Any documents or materials which a party expects to utilize in the event of trial (except for impeachment), but which are not stipulated, shall be identified in writing and exchanged by the parties at least 15 days before the first day of the trial session."

Materials not provided in compliance with our pretrial orders may be excluded from evidence.  Moretti v. Commissioner, 77 F.3d 637 (2d Cir. 1996).  Exclusion of documents under the standing pretrial order is particularly justified if they are complex and voluminous, as here.  See Kodak v. Commissioner, T.C. Memo. 1991-485, affd. without published opinion 14 F.3d 47 (3d Cir. 1993).  The 302 reports are not admissible because they were not exchanged at least 15 days before the first day of the trial session as required by our standing pretrial order.

In light of our ruling that the 302 reports are not admissible because they were not exchanged before trial, we need not consider petitioner's hearsay objection.

C.   Dondi Financial Stock

As stated above, petitioners bear the burden of proving that their basis in the Dondi Financial stock was as they claimed on their 1987 tax return, and respondent has the burden of proving that the Dondi Financial stock became worthless before 1987.  See par. A-5, p. 17.

1.   Basis

Petitioner paid $109,140 in cash and executed a $618,460 note for 6,800 shares of Dondi Financial stock. Respondent concedes and we find that petitioners' basis in the Dondi Financial stock was $727,600.

2. Worthlessness

a. Background

Respondent contends that the Dondi Financial stock became worthless in 1985 or earlier. We disagree, and we conclude that the Dondi Financial stock became worthless in 1987. We reach this conclusion regardless of which party has the burden of proof.

Stock is worthless if it has neither liquidating value nor potential value. Austin Co. v. Commissioner, 71 T.C. 955, 970 (1979). A corporation's stock has liquidating value if its assets exceed its liabilities. Id. A corporation's stock has potential value if there is a reasonable expectation that it will become valuable in the future. Morton v. Commissioner, 38 B.T.A. 1270, 1278 (1938), affd. 112 F.2d 320 (7th Cir. 1940). A corporation's stock may be worthless if the corporation declares bankruptcy, ceases to operate, liquidates, or has a receiver appointed, because these events can destroy the stock's potential value. Id.

Whether stock becomes worthless in a particular year is a question of fact. Boehm v. Commissioner, 326 U.S. 287, 293 (1945); Finney v. Commissioner, 253 F.2d 639, 642 (9th Cir.

1958), affg. in part and revg. in part T.C. Memo. 1956-247; Austin Co. v. Commissioner, supra at 969. The standard for deciding when stock becomes worthless varies according to the circumstances of each case. Boehm v. Commissioner, supra; Lucas v. American Code Co., 280 U.S. 445, 449 (1930). The taxpayer's attitude and conduct are considered, but are not dispositive. Boehm v. Commissioner, supra at 293; Aagaard v. Commissioner, 56 T.C. 191, 209 (1971).

b. Collapse of Vernon and Dondi Financial

Respondent contends that Dondi Financial became insolvent by 1985 because the real estate market crashed in 1984, Vernon paid millions of dollars of compensation to Vernon officers and directors from 1983 to 1986, and Vernon paid other flamboyant expenses. We disagree. We think other, more significant facts show that Dondi Financial stock did not become worthless in 1985. The FHLBB order required Vernon to change its financial practices to meet Federal regulatory standards. The FHLBB order required Vernon to prepare a comprehensive plan detailing business strategies and operations through June 30, 1989. These actions show that an effort was made by the FHLBB and Vernon to keep Vernon operating. It is reasonable to conclude that Dondi Financial stock had value as long as Vernon operated. We conclude that Vernon had value until the FHLBB appointed a receiver and ordered its liquidation and Dondi Financial declared bankruptcy in May 1987.

c.  Palmer's Testimony

Respondent contends that Dondi Financial stock had no liquidating value after 1984 because Palmer, the bankruptcy trustee's attorney during Dondi Financial's bankruptcy proceedings, testified that Dondi Financial was insolvent by 1984.  Respondent asserts that Palmer's opinion is convincing because he was independent and his findings are supported by a reasonable foundation (the real estate downturn from 1982 to 1984, and crash by early 1984; Vernon's liability for the loans owned by Dondi Residential Properties, Inc., for its property; and Vernon's extensive lending of money on commercial real estate projects).  We disagree.

Palmer believed that the FSLIC appraisers underappraised property, yet he relied on the FSLIC appraisals and did not use an independent appraiser.  Palmer did not consider Vernon's non-Texas assets.  Palmer was reviewing whether Dondi Financial had made any fraudulent conveyances within the last 4 years before its insolvency.  Under the then-applicable Texas fraudulent conveyances law, a transfer was void if a debtor (Dondi Financial) did not have enough assets in Texas to pay all of its debts.  Tex. Bus. & Com. Code Ann. sec. 24.03(a) (West 1986).[3] Thus, Palmer's valuation of Vernon and Dondi included only Texas assets.  See In re Dondi Financial Corp., 119 Bankr. 106, 108

---

[3] This statute was amended in 1987.  See Tex. Bus. & Com. Code Ann. sec. 24.003, Historical Note (West 1987).

(N.D. Tex. 1990). About 46 percent of the amount of Vernon loans was non-Texas loans; i.e., out-of-State loans made in Florida, California, Louisiana, and Oklahoma.

Palmer recognized that Vernon failed gradually. He said:

> Vernon Savings & Loan died by degrees. The first was the notice in '81, as I recall, to see if the Vernon Savings & Loan people could correct their own problems.
> The second * * * was [in 1986] when the federal government went in there and put their people in, to see if the supervision would help.
> The third was * * * [also in 1986] when the federal government actually took over the running of it, to see whether or not it could be sold.
> * * * The final take over, [in 1987] is after you've determined that none of those others will work. The patient is dead and it's time for a funeral. * * *

On March 20, 1987, the FHLBB seized Vernon, appointed the FSLIC as receiver, and reconstituted Vernon as VFSA. Dondi Financial filed its bankruptcy petition on May 9, 1987. We hold that this was when Dondi Financial stock became worthless.

d.   Petitioner's Testimony About Dondi Financial Assets and Liabilities

Dondi Financial received a $6 million tax refund check in December 1986. Petitioner testified that as of January 1987, Dondi Financial had liabilities of about $1.5 to $2 million. Respondent did not introduce evidence to rebut petitioner's testimony. Petitioner was knowledgeable about Vernon's and Dondi Financial's finances and was Dondi Financial's president from 1983 to 1984 and president of Vernon's California operations from 1984 to 1986. Petitioner estimated that Vernon had between $30

and $80 million in assets when Dixon bought it in 1981 and that those assets had grown to more than $200 million when petitioner returned to Dondi Financial in 1983. Petitioner also testified that a monthly report submitted to the FHLBB showed that Vernon had a positive net worth as of September 1986. While petitioner's testimony is less reliable than Vernon's or Dondi Financial's financial statements, we disagree with respondent's view that we should disregard it.

  e. Respondent's Other Contentions

Respondent points out that petitioner did not provide documents or expert testimony to establish the amount of Vernon's or Dondi Financial's liabilities for any year.

Petitioner testified to these points, but respondent urges us to disregard his testimony as self-serving. We may not arbitrarily disregard testimony that is competent, relevant, credible, and uncontradicted. Conti v. Commissioner, 39 F.3d at 664; Ansley v. Commissioner, 217 F.2d 252, 257 (3d Cir. 1954); Loesch & Green Constr. Co. v. Commissioner, 211 F.2d 210, 212 (6th Cir. 1954). We found petitioner's testimony to be credible and uncontradicted. Respondent contends that we should infer that any documentary evidence or testimony from prospective witnesses would have been unfavorable to petitioner. Respondent points out that where a party fails to introduce evidence in his or her possession, which, if true, would be favorable, there is a presumption that the evidence, if produced, would favor the

opposing party.  <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We do not apply that presumption here for several reasons. First, petitioner offered Vernon's monthly reports for March, June, and August 1986 and an unaudited statement of Vernon's financial condition for July and August 1986.  These exhibits were admitted to show their effect on petitioner and not for their truth.  However, since petitioners offered the documents, the rationale behind the negative inference under <u>Wichita Terminal</u> does not apply.  Second, petitioners introduced evidence that the Dondi Financial stock became worthless in 1987.  <u>Wichita Terminal</u> does not apply to situations where a party provides evidence sufficient to meet the burden of proof.  See <u>Ianniello v. Commissioner</u>, T.C. Memo. 1991-415; <u>Cohen v. Commissioner</u>, T.C. Memo. 1991-413.  Third, respondent, not petitioner, had the burden of proving that the Dondi Financial stock became worthless no later than August 1, 1985.  The <u>Wichita Terminal</u> presumption generally applies where the party failing to produce the evidence has the burden of proof.  <u>Wichita Terminal Elevator Co. v. Commissioner</u>, <u>supra</u> at 1165.  Fourth, respondent's contention that we infer that testimony by prospective witnesses not called at trial would be unfavorable to petitioner seems hypothetical at best since respondent did not identify any available witnesses who petitioners should have called.

       f.   <u>Testimony of Hodges and Hoque</u>

Respondent contends that testimony by Hodges and Hogue shows that Dondi Financial stock lost its value before 1984. As stated above, Hodges' and Hogue's testimony is inadmissible. See par. B, p. 17. However, even if we considered their testimony, our conclusion would remain the same.

Hodges and Hogue testified about criminal activities by Vernon officers. Hodges said that the FBI agents did not consider the financial impact those activities had on Vernon or Dondi Financial. Their testimony about Vernon's financial status consisted of examples of bad loans and accounting misrepresentations of delinquent loans to the Federal regulatory authorities and was based on the 302 reports, some of which were prepared by other agents. The testimony, although marginally relevant to the liquidating value analysis, is not helpful in deciding whether Dondi Financial stock had potential value.

As stated above, we conclude that petitioners' Dondi Financial stock became worthless in 1987.

3. Conclusion

We hold that petitioners may deduct $727,600 in 1987 for worthless Dondi Financial stock.[4]

D. Texana Capital Stock

1. Notice of Deficiency

---

[4] Respondent does not contend, and we therefore need not consider, whether petitioners had any debt-forgiveness income in respect of the Dondi Financial stock in 1987 or 1988.

In the notice of deficiency, respondent calculated the amount of petitioners' Texana Capital stock loss by subtracting what respondent determined petitioners' basis to be (zero) from the amount petitioners deducted ($199,600). Respondent gives no reason for making this calculation if respondent was intending to challenge the timing of petitioners' deduction. Respondent also determined that petitioners did not establish that the amount deducted "was (a) a loss, and (b) sustained by you." Respondent describes the determination as "broadly worded". While the language in the previous sentence is broad, the notice of deficiency also included the computation described earlier in this paragraph. As we concluded above regarding the Dondi Financial stock, we conclude that the notice of deficiency challenged petitioners' basis in their Texana Capital stock, but not that it became worthless in 1988. See par. A-4, p. 15. Thus, we need not address respondent's argument on brief that petitioners did not prove that their Texana Capital stock became worthless in 1988.

If we had to decide whether 1988 was the year in which petitioners' Texana Capital stock became worthless, however, we would find that 1988 was the appropriate year. In February 1987, petitioner agreed to sell his Texana Capital stock. Although a final agreement was never executed, petitioners would have made a $44,000 profit on the sale. This suggests that the Texana Capital stock had value in 1987. There is no indication in the

record that the stock became worthless until August 19, 1988, when the FHLBB placed Texana into receivership and appointed the FSLIC to liquidate Texana. Thus, if the year of worthlessness were in issue, every indication from the record, although sparse, is that the Texana Capital stock became worthless in 1988.

2. <u>Basis</u>

Petitioners' basis in the Texana Capital stock is the amount petitioner paid for it. Sec. 1012. The amount he paid includes cash and other property given in exchange for the property and any liabilities petitioner assumed or to which the property is subject. <u>Commissioner v. Tufts</u>, 461 U.S. 300, 307 (1983); <u>Crane v. Commissioner</u>, 331 U.S. 1, 11 (1947).

Petitioner bought 34,900 shares of Texana Capital stock for $199,600 on December 12, 1983. Petitioner borrowed $77,200 for the downpayment and executed notes for $106,795 and $15,605 to buy the stock.

Respondent contends that petitioners have not proven that they had basis in the Texana Capital stock because they did not provide a copy of the $15,605 promissory note or other documentary evidence showing how much petitioner paid and that petitioner's only evidence of payment is his testimony. We may not arbitrarily disregard testimony that is competent, relevant, credible, and uncontradicted. <u>Conti v. Commissioner</u>, 39 F.3d at 664. We found petitioner's testimony to be generally credible.

Respondent also contends that petitioner did not provide documentary evidence that he paid interest or principal on the $106,795 promissory note. Respondent finally contends that petitioner did not prove that the $77,200 he says that he paid in cash to buy Texana Capital stock went to Lemons to buy the stock.

Petitioner testified that he paid Lemons $31,795 on the $106,795 note and about $4,100 on the $15,605 note, and that he stopped paying Lemons when the FSLIC's injunction made him insolvent. Despite respondent's skepticism, we found petitioner to be credible. We believe that petitioner made payments on the $106,795 and $15,605 notes and that he used those notes and the $77,200 he borrowed to buy Texana Capital stock.

3.   Conclusion

We hold that petitioners' basis in the Texana Capital stock was $199,600 and conclude that petitioners are entitled to a $199,600 worthless stock deduction for Texana Capital stock in 1988.[5]

To reflect the foregoing and concessions,

Decision will be entered

under Rule 155.

---

[5] Respondent does not contend that, and we need not consider whether, petitioners had any debt-forgiveness income in respect of the Texana Capital stock in 1987 or 1988.